PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

MARY JANE BLOSSOM, in her
personal capacity and as personal
representative for the estate of Jeremy
Ray Pickup,

      Plaintiff - Appellee,

v.

JEFF YARBROUGH, in his personal
capacity, and as Deputy Sheriff of
Mayes County, Oklahoma,

      Defendant - Appellant,

and

FRANK CANTEY, in his personal
capacity and as Sheriff of Mayes
County, Oklahoma; MAYES
COUNTY BOARD OF COUNTY
COMMISSIONERS,

      Defendants.

No. 03-5146

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 02-CV-373-P)

Submitted on the briefs:[*]

Dick A. Blakeley, Sutton and Associates, P.C., Tulsa, Oklahoma, for Plaintiff - Appellee.

Robert S. Lafferrandre and Robert M. Anthony, Pierce, Couch, Hendrickson, Baysinger & Green, L.L.P., Oklahoma City, Oklahoma, for Defendant - Appellant.

———————————

Before **KELLY**, **HENRY**, and **MURPHY**, Circuit Judges.

———————————

**KELLY**, Circuit Judge.

———————————

Defendant-Appellant Jeff Yarbrough appeals the district court's denial of qualified immunity in connection with the shooting death of Jeremy Pickup. Mr. Pickup's mother and personal representative, Plaintiff-Appellee Mary Jane Blossom, brought this civil rights action pursuant to § 1983, alleging unnecessary and excessive force. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and Mitchell v. Forsyth, 472 U.S. 511 (1972), and reverse.

Background

At approximately 11 p.m. on June 30, 2001, Deputy Jeff Yarbrough

———————————

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1 (G). The cause therefore is ordered submitted without oral argument.

received a call from radio dispatch that there was an intoxicated person at Orchid Paper plant who refused to get out of someone's car. Deputy Yarbrough, two miles away from the plant, responded to the call. Upon arriving at the parking lot in front of the plant, he turned on his emergency lights and approached a small group of between six and eight people. As he approached, a large man, Mr. Pickup, walked away from the group. A woman shouted, "That's the guy right there."

Deputy Yarbrough identified himself as being with the Mayes County Sheriff's Office and asked Mr. Pickup to stop so that he could talk to him. The deputy also flashed his flashlight at Mr. Pickup. He continued to walk away from Deputy Yarbrough, who followed and caught up to Mr. Pickup. Mr. Pickup turned around, fists clenched, and mumbled something about "Fucking cops." The deputy again identified himself and asked Mr. Pickup who he was. He mumbled again about Deputy Yarbrough's gun and cops "messing with him." Yarbrough again asked Mr. Pickup for identification. Mr. Pickup tossed a Bureau of Indian Affairs (BIA) identification card at Deputy Yarbrough, who caught it against his chest. Deputy Yarbrough noticed that Mr. Pickup smelled like alcohol and suspected he may have been on drugs because although Mr. Pickup was not staggering, he was acting strange. At the time, Deputy Yarbrough was approximately 5'11" tall and weighed 180 pounds, whereas Mr. Pickup was

approximately 6'4" and weighed 265 pounds. Deputy Yarbrough realized he could not physically handle Mr. Pickup and radioed for backup, whereupon Mr. Pickup told him, "you're not going to need any fucking backup."

Deputy Yarbrough tried to calm Mr. Pickup. He observed Mr. Pickup's intoxicated state and said that maybe he could give him a ride home. He asked Mr. Pickup to sit down on the curb and move closer to his cruiser, but Mr. Pickup said, "I ain't sitting fucking nowhere." Mr. Pickup then reached out and grabbed the BIA card from Yarbrough, grabbing the deputy's protective vest and pulling on it. Deputy Yarbrough pushed Mr. Pickup off as hard as he could, backed up, drew his weapon, and ordered him to get on the ground. He refused, cursed at Deputy Yarbrough and walked away. Yarbrough put away his weapon, radioed for backup and called to Mr. Pickup, saying he should just wait until the other officer arrived and that what happened was probably no big deal.

Mr. Pickup ignored Deputy Yarbrough and took off running. As Mr. Pickup ran around the corner of the Orchid Paper building which had a light on it, Deputy Yarbrough thought he saw a silver locking blade knife in Pickup's pocket. He followed Mr. Pickup and continued to radio for backup. The woman who had initially identified Mr. Pickup informed Deputy Yarbrough that "there [was] another guy." Deputy Yarbrough continued to follow Mr. Pickup down the side of the building, over a street, over two large steam pipes and through an open

- 4 -

field until he lost sight of Mr. Pickup around the corner of a building.

Deputy Yarbrough rested for a minute and then continued in the direction he thought Mr. Pickup went. He saw Mr. Pickup go around a building about 85-90 yards away, and ran to the building, pulled his weapon, and proceeded slowly around the corner. Mr. Pickup jumped from behind a stack of wooden pallets and ran at him full speed, screaming he was "going to take [Yarbrough's] gun and shove it up [Yarbrough's] ass," and that he was tired of cops "fucking with him." Deputy Yarbrough ran backwards from Mr. Pickup, yelled at him to get on the ground and told him that he was too tired to fight. Mr. Pickup moved towards Deputy Yarbrough and threatened to take his gun. Deputy Yarbrough continued to back up. He pleaded with Mr. Pickup to get on the ground and said he didn't want to shoot but couldn't back up anymore. Mr. Pickup continued to yell about Yarbrough's gun and began moving his hands. Deputy Yarbrough tried to shine his flashlight on Mr. Pickup's hands to ascertain whether he had a weapon but was unable to do so because Mr. Pickup's hands were moving rapidly. Mr. Pickup approached toward Deputy Yarbrough again and backed him up to the edge of the parking lot–approximately 60-75 yards from the stack of pallets. Again, he told Mr. Pickup to get on the ground and warned he would shoot if Mr. Pickup refused to comply. Mr. Pickup continued approaching Deputy Yarbrough, reaching for Deputy Yarbrough's weapon. When Mr. Pickup was approximately

5-7 feet away, Deputy Yarbrough shot.

Officer Justin Couch arrived on the scene moments before the gunshot. He observed a deputy backing up to the road and a person coming toward that deputy. Officer Couch observed the men were about 5-10 feet apart. As Officer Couch made a u-turn in his car, he heard a gunshot. He radioed for an ambulance and ran to Deputy Yarbrough. Deputy Yarbrough told Officer Couch that Mr. Pickup had something in his pocket. No weapon was found.

The district court denied Deputy Yarbrough's motion for summary judgment on qualified immunity grounds.

> In the instant case, there were no witnesses to the actual shooting. The sequence of events took twenty-three minutes from Deputy Yarborough's arrival on the scene until the fatal shot was fired. The undisputed record reveals that Pickup was not armed and was shot from a distance of five to seven feet. Blossom admits that there was a confrontation between Deputy Yarbrough and Pickup at Evans Electric, but does not admit Pickup was lunging.

Aplt. App. 175. In addition to the failure to admit certain facts, the district court also appears to have relied upon certain inconsistencies in Deputy Yarbrough's testimony in denying summary judgment. The district court relied upon Carr v. Castle, 337 F.3d 1221, 1226-27 (10th Cir. 2003), which affirmed the denial of qualified immunity to police officers after concluding that a contrary holding would require a court to view the facts solely from the perspective of the officers.

Deputy Yarbrough argues on appeal that (1) the district court erred as a

matter of law in determining that a non-moving party's failure to admit a material fact in and of itself creates a disputed fact for the purposes of denying qualified immunity on summary judgment and (2) even if the court accepts Ms. Blossom's view of the facts, she failed to show that Deputy Yarbrough violated a clearly established right.

## Discussion

Generally, a district court's denial of summary judgment is not immediately appealable. McFall v. Bednar, 407 F.3d 1081, 1086 (10th Cir. 2005). A district court's denial of a summary judgment motion, however, is subject to immediate appeal when the defendant is a public official asserting qualified immunity and the issue appealed is one of law. Behrens v. Pelletier, 516 U.S. 299, 312-13 (1996). That is, the scope of our inquiry is limited to legal challenges to the denial. Behrens, 516 U.S. at 312-13; McFall, 407 F.3d at 1086. We can reverse on an interlocutory basis if Ms. Blossom's version of the facts does not amount to the violation of a clearly established right. Perez v. Ellington, 421 F.3d 1128, 1131 (10th Cir. 2005). This is true even if some of the facts are controverted. Johnson v. Martin, 195 F.3d 1208, 1213 (10th Cir. 1999).

Where the district court has identified facts that it assumed in denying summary judgment, we generally lack jurisdiction to review underlying questions

of evidentiary sufficiency.  Johnson v. Jones, 515 U.S. 304, 318-19 (1995).  Instead, the court of appeals usually takes the facts as assumed by the district court in conducting its review of pertinent legal questions.  Id. at 319.

Deputy Yarbrough makes a persuasive case that the district court allowed Ms. Blossom to proceed to trial merely by refusing to admit that there is no countervailing evidence that her son lunged.  Of course, Ms. Blossom has no personal knowledge of the events in question.  In equating the refusal to admit with the affirmative submission of conflicting evidence, the district court was plainly wrong.  See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  From a jurisdictional perspective, the question is whether a plaintiff may create a genuine issue of material fact by merely refusing to admit the facts which defendant supports by undisputed evidence without herself presenting any conflicting facts.  Though the substantive answer is obvious, we need not determine whether this question is a jurisdictionally permissible abstract question of law that may be resolved in a qualified immunity appeal.  See Behrens, 516 U.S. at 313.  Instead, we resolve the case on Deputy Yarbrough's second argument, that the shooting was objectively reasonable notwithstanding the district court's identification of various disputed facts.

We review the district court's denial of qualified immunity de novo.  Id.;

McFall, 407 F.3d at 1086. Qualified immunity requires a court to ask (1) whether taken in the light most favorable to the plaintiff the facts alleged show the officer's conduct violated a constitutional right, and if so, (2) whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001); Philips v. James, 422 F.3d 1075, 1080 (10th Cir. 2005); Lawrence v. Reed, 406 F.3d 1224, 1230 (10th Cir. 2005) (amplifying the Supreme Court test with a three-part inquiry).

We analyze the use of deadly force against a suspect under the Fourth Amendment, which guarantees citizens the right to be free from unreasonable searches and seizures. Terry v. Ohio, 392 U.S. 1, 8 (1968); Graham v. Connor, 490 U.S. 386, 388 (1989) (claims of excessive force in the context of arrests should be analyzed under the Fourth Amendment's objective reasonableness standard); Tennessee v. Garner, 471 U.S. 1, 7 (1985). We evaluate reasonableness under the Fourth Amendment by examining the totality of circumstances of the particular seizure. Ohio v. Robinette, 519 U.S. 33, 39 (1996). A police officer may reasonably use deadly force to apprehend a fleeing suspect if the officer has probable cause to believe that the suspect poses a serious threat of physical harm either to the officer or others and if, where feasible, the police warn the suspect. See Garner, 471 U.S. at 11-12. We must assess reasonableness from the perspective of a reasonable officer on the scene,

"rather than with the 20/20 vision of hindsight," and consider that "police officers . . . make split-second judgments–in circumstances that are tense, uncertain and rapidly evolving–about the amount of force necessary in a particular situation." Graham, 490 U.S. at 396-97.

Deputy Yarbrough's account of what happened on the night of June 30, 2001, is largely uncontroverted. Ms. Blossom does not dispute the facts tending to show that her son engaged Deputy Yarbrough and was confrontational and aggressive; that Deputy Yarbrough tried to diffuse the confrontation and warned Mr. Pickup several times to get on the ground; that Mr. Pickup was larger than the officer; that Deputy Yarbrough believed Mr. Pickup at the time to be drunk, high and possibly armed; that the deputy knew there were civilians nearby; that he was alone and in the dark; and that he shot Mr. Pickup from a distance of five to seven feet. This account is consistent with the forensic evidence and the testimony of Ms. Blossom's own expert.

None of the ostensibly controverted facts identified by the Ms. Blossom preclude a determination that the shooting was objectively reasonable. Even assuming that Mr. Pickup did not lunge at Deputy Yarbrough, Mr. Pickup repeatedly refused to comply with the reasonable requests of law enforcement and continued his approach towards Deputy Yarbrough, ultimately reaching toward the deputy's gun. The fact that Mr. Pickup was unarmed is not outcome

determinative. We have previously rejected the argument that only a suspect armed with a deadly weapon poses a physical threat sufficient to justify use of deadly force. See Ryder v. City of Topeka, 814 F.2d 1412, 1419 n.16 (10th Cir. 1987). Even assuming "inconsistencies" in Deputy Yarbrough's later deposition when compared with his more contemporaneous statements about the incident, the more complete and detailed deposition does not contradict, as to any material fact, the earlier statements. See Collins v. Jordan, 110 F.3d 1363, 1370 (9th Cir. 1996) (on qualified immunity appeal, court of appeals may consider legal question of whether a fact is material).

In analyzing the reasonableness of Yarbrough's use of force, we must also consider, as an element of the totality of the circumstances test, whether the officer's own "reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir. 2004) (quoting Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995)). "Only events 'immediately connected' with the actual seizure may be considered, and 'mere negligent actions precipitating a confrontation would not, of course, be actionable under §1983.'" Id. Ms. Blossom has argued, relying on an expert witness, that Deputy Yarbrough created the need to use the deadly force by pushing Mr. Pickup after he grabbed his protective vest, following Mr. Pickup without waiting for backup, not carrying and using a baton or OC spray to subdue

- 11 -

Mr. Pickup, and not conducting a preliminary investigation to discover Mr. Pickup's nature and character. It is well settled that the "reasonableness standard does not require that officers use alternative, less intrusive means" when confronted with a threat of serious bodily injury. Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001) (internal quotations omitted). None of these actions or inactions Ms. Blossom identifies rise to the required level of recklessness.

This case is readily distinguishable from Carr upon which the district court relied. In that case, the plaintiff relied on testimony that the officers fired eleven shots at the suspect after he had dropped a piece of concrete that the officers claimed was a possible weapon. All eleven shots struck the decedent in the back! Carr, 337 F.3d at 1225, 1227. The court in Carr, viewing the facts in the light most favorable to the plaintiff, determined that there was some evidence the officers shot an unarmed man who was not advancing on them. Id. at 1227 n.6. In this case, the evidence indicates uncertainty in the mind of Deputy Yarbrough as to whether Mr. Pickup was armed. Mr. Pickup advanced on Yarbrough in what reasonably appears to be an effort to get his weapon. Under these circumstances, Mr. Pickup posed an immediate threat to the safety of the officer, and the use of deadly force, while tragic, was reasonable.

REVERSED.

03-5146, *Blossom v. Yarbrough*

**HENRY, J.**, concurring.

Although it is close, I agree with the majority that the objective reasonableness of the shooting entitles Deputy Yarbrough to qualified immunity. However, I do not think the district court was "plainly wrong" in equating Ms. Blossom's "refusal to admit with the affirmative submission of conflicting evidence." Opinion at 7. I believe the district court found other factual disputes from the incident independent of Ms. Blossom's refusal to admit that her son lunged at Deputy Yarbrough.

In situations where the only witness to a fatal shooting is an "interested" one, we should proceed with caution. Here, the district court examined the testimony of Ms. Blossom's expert and Officer Couch, along with the differing accounts of Deputy Yarbrough after the shooting and later in his deposition. I believe it was appropriate to consider these factors as presenting conflicting evidence and justifying additional fact-finding.