In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1337

MARTHA V. DELUNA, individually and
as Administrator for the Estate of Luis
Roberto DeLuna, deceased, and as next
friend of her minor children Martha
Virydiana, Alejandra and Luis Roberto,

*Plaintiff-Appellant,*

*v.*

CITY OF ROCKFORD, ILLINOIS, RANDALL
PERAZA, LIEUTENANT SALMONE, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 00 C 50040—**Philip G. Reinhard**, *Judge.*

ARGUED JANUARY 17, 2006—DECIDED MAY 18, 2006

Before BAUER, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* On March 21, 1998, officer
Randall Peraza responded to a report of a domestic distur-
bance, and his subsequent encounter with Luis Roberto
DeLuna culminated in the fatal shooting of DeLuna by
Peraza. DeLuna's widow, on behalf of herself and her minor
children, filed this action pursuant to 42 U.S.C. § 1983 and

Illinois law against Peraza, alleging Fourth Amendment and wrongful death claims. The plaintiff also raised challenges to the actions of other officers following the shooting who took the statement of herself and her daughter, arguing that their actions violated the Fourth and First Amendments. Mrs. DeLuna reverted to her maiden name, Martha Lopez, following the death of her husband, and will be referred to by that name throughout this opinion.

The district court granted summary judgment in favor of the defendants, and Lopez appeals. Therefore, we must consider the facts including reasonable inferences therefrom, in the light most favorable to Lopez. *Fisher v. Lovejoy*, 414 F.3d 659, 661 (7th Cir. 2005).

We first consider Lopez's Fourth Amendment and wrongful death claims arising out of the death of DeLuna. The Fourth Amendment is implicated because a police officer's use of deadly force constitutes a seizure within the meaning of that amendment and therefore is constitutional only if it is reasonable. *Tennessee v. Garner*, 471 U.S. 1, 7, 11 (1985); *Scott v. Edinburg*, 346 F.3d 752, 755-56 (7th Cir. 2003). Reasonableness is not based on hindsight, but rather is determined considering the perspective of the officer on the scene, allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Scott*, 346 F.3d at 756. The focus is on whether the actions of the officer are objectively reasonable. *Id.* If an officer believes that the suspect's actions place him, or others in the immediate vicinity, in imminent danger of death or serious bodily injury, deadly force can reasonably be used. *Scott*, 346 F.3d at 756; *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002).

The facts undisputed by Lopez are themselves sufficient to establish imminent danger to Peraza so as to render

deadly force reasonable. At approximately 4:14 on the morning of March 29, 1998, Peraza received a dispatch regarding a domestic disturbance at Lopez's residence. This was not Peraza's first call to that home. In fact, eight days earlier, Peraza had responded to a similar call from that residence. On that occasion, Peraza perceived that DeLuna was intoxicated and was yelling at Lopez. Lopez informed Peraza that DeLuna was known to be very violent. He was also aware from that experience that Lopez had a daughter who was a minor. DeLuna was arrested at that time and placed in a holding cell. Peraza was subsequently told by other officers that in the holding cell, DeLuna became very violent, punching and slamming his head against the cement walls.[1] At the time of this incident, Peraza observed that DeLuna had an extensive arrest history, and Lopez told him that DeLuna was known to carry weapons. That was consistent with an earlier experience in which Peraza recorded a written statement from a person who stated that he had purchased guns from DeLuna.

With the knowledge gained from that earlier exposure to DeLuna and Lopez, Peraza responded to the 911 call in the early morning hours of March 29, arriving at the house approximately a minute after receiving the dispatch and advising dispatch that he was at the scene. From inside the squad car, he could not see the suspect, DeLuna. His main concern as he arrived was whether DeLuna was in the house. He was aware that children had been present in the house the week prior, and that Lopez had told him that she had been battered badly before. Peraza exited his vehicle and walked toward the front of it. Lopez saw Peraza from

---

[1] This statement was not agreed to by Lopez, although her objection was not to the substance but that it was inadmissible hearsay. That objection would not impact its use in establishing Peraza's state of mind, rather than for the truth of the matter.

the kitchen window, and she continued to yell to him outside the entire time after Peraza left his squad car. As Peraza was proceeding to the front of his vehicle, something caught his attention from the right side. He saw movement in the dark, and then recognized DeLuna standing at the northwest corner of the house. DeLuna had no shirt on even though it was 4:14 a.m. on that Spring day, and he did not appear to be cold. Peraza said "Hey Concepcion, Concepcion" a couple of times to get DeLuna's attention, asking "What's going on?"[2]

DeLuna responded: "I've got something for you. You are going to have to kill me." Peraza had his gun drawn, and told DeLuna to raise his hands. DeLuna did not raise his hands, but began walking towards DeLuna with his arms extended out to his sides. Peraza and DeLuna were facing each other, and therefore Peraza would not have been able to see whether DeLuna possessed any weapon in his back waistband. As DeLuna walked toward Peraza, Peraza began to walk backward, maintaining a distance between the two. As Peraza and DeLuna turned to move southward along the east side of the house, Peraza continued to back away from DeLuna. As DeLuna moved along the east side of the house toward the back-pedaling Peraza, DeLuna told Peraza "If you are going to shoot me, shoot me here," pointing to his chest with his right hand. Lopez was yelling out the window as the scene unfolded. In the course of yelling, she told Peraza not to shoot, stating that DeLuna had nothing in his hands. At some point, Lopez could no longer see or hear Peraza and DeLuna from the back window, and she moved to the east side kitchen door.

Because Peraza was walking backward and looking at DeLuna the entire time, he did not know what was behind

---

[2] All of the conversations between Peraza and DeLuna on this night were in Spanish, but will be set forth in English in this opinion.

him. He told DeLuna to "stop," but DeLuna disregarded him and continued walking toward him. There was a dirt hole in the driveway and a black plastic pipe in the dirt that was hooked up to a downspout from the roof. Peraza stumbled at that point and struggled to maintain his balance. In the meantime, Lopez's houseguest was pulling Lopez into the kitchen away from the door, and pulled her to the floor. When Lopez hit the floor, she heard a shot fired. Before she heard that shot, 2-3 seconds had passed when she was unable to see what was happening outside.

All of that is conceded by Lopez. In addition to that, Peraza stated that DeLuna lunged toward him as he stumbled, and that he feared DeLuna was either reaching for a weapon behind his back or attempting to reach Peraza's weapon. At that time, he fired the shot. Lopez disputes that statement, arguing that Peraza should not be believed because he provided differing explanations as to what he feared. What is uncontested, however, is that DeLuna was disregarding Peraza's order to stop and to raise his hands, and that Peraza continued to back up before and after killing DeLuna, with his momentum carrying him out of the mud hole. Also undisputed is that Peraza was only on the scene for 1 minute, 25 seconds before shooting DeLuna, and backed up 40-50 feet over that period of time. Finally, Lopez acknowledges the expert testimony presented by Peraza, that to a reasonable degree of medical, forensic, and scientific certainty, at the time of the bullet entry, DeLuna had a flexed forward torso, which is one in which the person is leaning forward at the waist. The expert further attested that the bullet angle would be consistent with the suspect making a lunging motion towards the officer. The expert opinion was premised upon the hypothetical that: Peraza fired one shot which struck DeLuna; Peraza fired his weapon using his left hand while moving backward in a slightly crouching position; Peraza and DeLuna were anywhere from 5-15 feet apart when the

shot was fired; the height difference between Peraza and DeLuna was within 1-2"; DeLuna was on his feet when struck by the bullet; and Peraza and DeLuna were on level terrain within plus or minus 5 inches of elevation. Lopez did not provide any evidence disputing the premise of the hypothetical.

The undisputed facts in the record demonstrate that Peraza acted reasonably in firing the shot. At the time of the shooting, Peraza was presented with a suspect who had a history of violence, and who was known to both carry and sell weapons. Peraza could not know whether DeLuna possessed a weapon in the back of his waistband. DeLuna was acting in an irrational manner, appearing shirtless and disregarding repeated instructions to raise his hands and to stop. DeLuna's refusal to heed those demands and his continued approach towards Peraza posed a danger to Peraza. The potential danger inherent in that situation was escalated by the threat made by DeLuna when he first saw Peraza that he "had something for" Peraza and that Peraza was going to have to kill him. His subsequent statement that if Peraza was going to shoot him, he should shoot him in the chest further indicated that this was a dangerous situation, both in its anticipation of violence and in its implication that the shot had better be fatal. The combination of those undisputed statements at a minimum established an unstable situation with an uncooperative person who had a history of violence and weapons possession. After backing up 40-50 feet in less than a minute and a half, Peraza stumbled, and fired a shot at DeLuna. The uncontradicted expert testimony was that DeLuna was leaning forward at the waist towards Peraza at the time of the shot, which is consistent with Peraza's testimony that DeLuna lunged towards him as he stumbled. Lopez has presented nothing contradicting that testimony. Regardless of whether Peraza saw a gun or believed DeLuna was reaching for Peraza's weapon, the action of DeLuna lunging

towards him after the threats and bizarre conduct, established the real danger of imminent serious bodily injury should DeLuna succeed in reaching Peraza. Peraza need not wait until there is a physical struggle for control of his weapon before a situation presents an imminent danger of serious physical injury.

This case is similar to a situation addressed recently by the Tenth Circuit in *Blossom v. Yarbrough*, 429 F.3d 963 (10th Cir. 2005), in which the court concluded that the use of deadly force was reasonable. In *Blossom*, the court was presented with similar facts of a confrontational person advancing on an officer, with the suspect eventually shot by that officer. Contrary to our case, the officer in *Blossom* had actually pursued the suspect, who had been accused of refusing to leave someone's car but had attempted to walk away from the confrontation once the officer arrived. *Id.* at 965-66. Ultimately, however, the suspect became confrontational, continuing his approach towards the officer who attempted to maintain distance from him by walking backward, and disregarding the officer's instructions to get on the ground. *Id.* The evidence was in dispute as to whether the suspect in *Blossom* lunged towards the officer before being shot, but it was clear that the suspect was advancing on the officer in what reasonably appeared to be an effort to get his weapon, and that was sufficient for the court to determine that deadly force was reasonable to address the immediate threat to the officer's safety. DeLuna's conduct in this case similarly presented an immediate threat to the officer's safety, and the district court properly granted summary judgment to the defendants on this ground.

Lopez asserts, however, that even if the § 1983 standard is not met, she can still establish wrongful death under state law, and that the district court erred in treating the two as synonymous. It is true that the district court did not address separately the standards of wrongful death under

Illinois law, and that the two are not necessarily cotermi-nous. In fact, in *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998), we recognized that a court may find conduct to be unreasonable for Fourth Amendment purposes, but not willful and wanton so as to violate Illinois law. Lopez, however, seeks the opposite result; she seeks a determination that conduct which is a reasonable response under the Fourth Amendment nevertheless can constitute willful and wanton conduct under state law. The difficulties of such a quest are apparent.

Lopez argues that in the wrongful death claim, in con-trast to the § 1983 claim, the court must determine whether Peraza's alleged reckless actions caused the situation to escalate, creating an unreasonably dangerous situation. She argues that Peraza failed to follow department policy that would have required him to wait for backup unless the situation demanded immediate action. It is questionable whether one could actually characterize an officer's conduct to be in reckless disregard for the safety of others when, knowing that a violent, potentially-armed man could be in a house with minor children and that the occupants have sought police aid, he decides not to wait by the car before attempting to help or at least further assess the situation. We need not decide that issue, however, because the sequence of events conceded by Lopez do not reveal any such conduct. The undisputed facts are only that Peraza was walking toward the front of his car when he perceived movement from the corner of his eye and recognized DeLuna. He had not yet had the opportunity to approach the house or otherwise intervene without the assistance of backup officers. Once he observed DeLuna, he simply called to DeLuna and asked what was going on. DeLuna's re-sponse that he "had something" for Peraza and that Peraza was going to have to kill him, as well as DeLuna's action in walking toward Peraza, escalated the encounter, not any action by Peraza. Thus, Lopez has failed to allege facts that

Peraza was acting in a reckless manner that created the dangerous situation, and therefore we need not consider whether Illinois would recognize such a claim; it has not been established here in any case. Accordingly, the district court did not err in granting summary judgment on these claims. Because we uphold summary judgment on the claims, we need not consider the plaintiff's First Amendment claim that was expressly conditioned on success on the claims relating to the death.

Lopez also asserts a Fourth Amendment claim on behalf of herself and her 13-year-old daughter, based on the conduct of the police following the shooting. Shortly after the shooting, the police transported Lopez and her daughter, Martha DeLuna, to the police station to take their statements regarding the events that had transpired. Lopez claims that the police questioning of her and her daughter following the shooting constituted an unreasonable seizure under the Fourth Amendment.

A person is "seized" for Fourth Amendment purposes "only if, in view of all of the circumstances surrounding the incident, a reasonable person [in the subject's position] would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). We have described the type of circumstances in which a reasonable person might believe that he was not free to leave. For instance,

> [t]he Supreme Court has noted that a reasonable person might not believe he was free to leave when faced with "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554. Furthermore, this court has noted some other factors that might influence a reasonable individual to

believe that he was not free to leave: "whether the encounter occurred in a public or private place; whether the suspect was informed that he was . . . free to leave; . . . whether there was physical touching, display of weapons, or other threatening conduct; and whether the suspect eventually departed the area without hindrance." *United States v. Scheets*, 188 F.3d 829, 836-37 (7th Cir. 1999), *cert. denied*, 528 U.S. 1096 (2000).

*Leaf v. Shelnutt*, 400 F.3d 1070, 1089-90 (7th Cir. 2005). Lopez has failed to present any evidence of coercion or conduct that would lead a reasonable person to believe that she was not free to leave. In fact, the record belies any such belief. One of the undisputed statements of fact is that Martha DeLuna "agreed" to go to the police station to provide a statement. In the statement of undisputed facts, the plaintiff further acknowledges that the officers had a legitimate interest in interviewing them shortly after the incident, that it was reasonable for them to be interviewed separately, and that Lopez was never searched or handcuffed, and no one grabbed her arms or hands to lead her along when she walked to the police car. Significantly, in her deposition when describing her time at the police station, Lopez acknowledged "I could probably have left or tried to get out," but stated that she did not do so because she trusted that the police would take her to the hospital as soon as possible to see her husband. That is inconsistent with a belief that she was not free to leave. The plaintiff did not present any evidence of police conduct that was coercive or threatening, or otherwise establishing that they were not in fact free to leave. The closest that Lopez comes is a statement that the police brought her to a room and told her to stay there, but she later characterized the statement as simply telling her to wait there. That is inadequate to establish a reasonable belief that she was not free to leave. Nor does Lopez's own conduct indicate that she was intimidated by the police authority. Although it took hours for the

police to finish preparing her statement, much of that delay was because the police provided an interpreter for Lopez, and because the statement was redone three times when Lopez told the officers that information was missing from the statement, and requested that it be retyped to include that information. At most, Lopez has demonstrated that the officers wanted to interview them after the shooting, and that the officers facilitated that interview by providing transportation to the police station and promising to transport them to the hospital when the statements were completed. The officers mere desire to interview them promptly does not equate with coercion, and Lopez has provided nothing more in this record. Accordingly, the district court properly granted summary judgment on this claim as well. The decision of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*