**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 20, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ESTATE OF JASON WATERHOUSE,
through its personal representative Heather
Lopez; AMBER WATERHOUSE,
daughter of Jason Waterhouse deceased,

     Plaintiffs - Appellants,

v.

MARC DIREZZA, Sergeant, in his
individual capacity; CITY OF
LAKEWOOD, COLORADO, a
municipality,

     Defendants - Appellees.

No. 23-1360

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:21-CV-00982-KAS)**

_____

Norman R. Mueller, Haddon, Morgan & Foreman, P.C., Denver, Colorado, (Adam
Mueller, Haddon, Morgan & Foreman, P.C., and Tim Galluzzi, Cheney Galluzzi &
Howard, LLC, Denver, Colorado, with him on the briefs), for Plaintiffs-Appellants.

Patrick T. Freeman, Lakewood City Attorney's Office, Lakewood, Colorado, (John
VanLandschoot, Lakewood City Attorney's Office, Lakewood, Colorado, with him on
the briefs), for Defendants-Appellees.

_____

Before **HARTZ**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Jason Waterhouse was high on methamphetamine and acting destructively in his sister's home. By the time Lakewood Police Department (LPD) officers arrived, he had barricaded himself in the basement. Officers tried for over an hour to get him to come out; but rather than cooperating, he started a fire. Seven officers went down to the basement to try to find the source of the fire and extricate Mr. Waterhouse. They saw him shoving a large stick through the wall before slamming the bedroom door shut. It quickly became apparent that the fire and the smoke were more serious than the officers had anticipated, and they were ordered to evacuate.

Assigned to provide lethal cover, Sergeant Marc Direzza was one of the last two officers in the basement. As several others were still hurrying up the stairs, Mr. Waterhouse burst out of the bedroom, heading toward the two remaining officers, who were six-to-ten feet from the door. The other officer fired his beanbag shotgun, hitting Mr. Waterhouse. Sergeant Direzza fired his pistol three times in rapid succession. One of the bullets struck Mr. Waterhouse in the back, killing him.

Mr. Waterhouse's estate (the Estate) brought a Fourth Amendment excessive-force claim under 42 U.S.C. § 1983 in the United States District Court for the District of Colorado. The district court granted Sergeant Direzza summary judgment on the § 1983 claim. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

The issue in this appeal is whether Sergeant Direzza is entitled to qualified immunity. We conclude that he is. Under these dangerous circumstances, his use of lethal force complied with the Fourth Amendment.  Even if Mr. Waterhouse was not carrying a

Page 2

weapon when he was shot, Sergeant Direzza could reasonably believe that he posed a threat of serious physical harm to himself or other officers. Given the fire and smoke, a wrestling match in the basement could have been fatal. In addition, Sergeant Direzza did not violate clearly established law. No controlling precedent forbids officers from using lethal force in such circumstances.

## I.    BACKGROUND

### A.    The Shooting

Unless otherwise indicated, the following facts were undisputed in the summary-judgment proceedings.

On December 19, 2019, a woman called 911. Having spoken to Heather Lopez, Mr. Waterhouse's sister, she relayed the following information: Mr. Waterhouse "was agitated and had barricaded himself under the stairs" at Ms. Lopez's home; "he had been like this" since the previous night; he was "on something," most likely alcohol and methamphetamine ("his drug of choice"); "he had done things like this before" while drinking; he had never been diagnosed with a mental illness, but he was "hearing voices and thought that someone was coming to hurt him"; he had constructed a "shiv" by attaching a blade to a screwdriver, though Ms. Lopez had taken it away from him; he was now "armed with a hammer" and "striking objects" with it; and there were "no guns in the house," but Ms. Lopez did not know if he had any other weapons. Joint App. at 1052–53, 1064 (internal quotation marks omitted).

When LPD officers reached Ms. Lopez's home at 3:32 p.m., she told them that Mr. Waterhouse was "out on bond for assaulting an officer." *Id.* at 1053. From

outside, officers ordered Mr. Waterhouse to come out of the basement. But they heard only "crashing sounds." *Id.* Given Mr. Waterhouse's history of usage and bizarre behavior, the officers believed that Mr. Waterhouse was high on methamphetamine. (Testing later confirmed so.) They told Ms. Lopez that they would "probably not try to force [him] out" if she did not want him to be charged for the damage. She responded, "Then yeah, . . . if that's what it takes cuz I can't deal with this." *Id.* at 1054.

Sergeant Eric Ebeling, a SWAT negotiator, entered the home with several others, moving to the top of the basement stairs. He tried to coax Mr. Waterhouse out, but Mr. Waterhouse, who was wielding a hammer, refused. The parties debate whether he was using the hammer to "violent[ly] attack[]" the house, Aplee. Br. at 5, or just to "barricade himself" under the stairs, Aplt. Br. at 7. Regardless, he was belligerent, shouting back: "get some," "come get some," "I want to get hurt," "faggots," "n***," "mother fucker," "I got something for you," and "shit's gonna fly mother fucker." Joint App. at 1054–55 (internal quotation marks omitted). For more than an hour, the officers tried "various de-escalation techniques" to resolve the situation peacefully. *Id.* at 1055. Instead of complying, Mr. Waterhouse started a fire.

During this standoff, Sergeant Direzza, a tactical supervisor with LPD SWAT who had extensive de-escalation experience, contacted Sergeant Ebeling to offer his assistance. Sergeant Ebeling gratefully accepted. Shortly after Sergeant Direzza arrived, smoke began drifting out of the basement. But Mr. Waterhouse remained downstairs, causing Sergeant Ebeling to worry that the fire department would be

Page 4

unable to deal with the fire. He decided that they would try to extract Mr. Waterhouse and locate the fire.

At 5:23 p.m. seven officers descended into the basement. While others had non-lethal or less-lethal weapons—including tasers and a beanbag shotgun—Sergeant Direzza was carrying a pistol and was assigned to provide lethal cover for the other officers. The Estate asserts that the sergeant's "presence was not required," Aplt. Br. at 8, but it does not contest that lethal cover was a "necessary role," Aplee. Br. at 6.

The officers quickly realized that the fire was more intense than they had anticipated. Heavy smoke enveloped the basement. The parties debate how well the officers were able to see, but they do not dispute that "[a]lmost immediately, the chaotic environment was an obvious risk to the officers' safety." Joint App. at 1057.

Officers then glimpsed Mr. Waterhouse "shoving a large stick through the wall" before slamming the bedroom door, next to the stairs. *Id.* Sergeant Direzza heard an officer yell that Mr. Waterhouse had a "club" (the dispatch records reflect that he had a "large stick in his hand"). *Id.* at 343, 1058. Officers ordered Mr. Waterhouse to come out of the bedroom and show his hands. He did not comply.

Discovering that Mr. Waterhouse had lit the fire under the stairs, Agent Chase Williams described flames "blasting through": "it was like a vacuum of flame . . . actively coming into the basement." *Id.* at 1058. Sergeant Ebeling and Sergeant Direzza ordered the team to evacuate because of the danger. Sergeant Ebeling estimated that they were in the basement for just two minutes; the time stamps on the dispatch records

show that they were downstairs for slightly less. At least one officer had to be given oxygen because of smoke inhalation. Agent Williams's hair was "singed." *Id.* at 1059.

Sergeant Direzza and Agent Williams were the last officers left in the "small, cluttered room." *Id.* at 1061. Movement was very restricted given the fire and the officers in the stairwell. Because Sergeant Direzza was providing lethal cover, he told Agent Williams to get out first. But while several officers were still hurrying up the burning stairs, Mr. Waterhouse "burst out" of the bedroom and "rushed toward" the two remaining officers from six-to-ten feet away. *Id.* at 1060. Although he was unarmed, he did not do or say anything to suggest he was surrendering. Suggesting the contrary, Agent Williams testified that Mr. Waterhouse was "screaming either, 'Fuck you,' or 'Fuck'" when he came "crashing out." *Id.* at 547.

The parties dispute whether Mr. Waterhouse "charged at" the officers, Aplee. Br. at 8, or whether he was "just trying to run up the stairs," Aplt. Br. at 9. The parties also dispute whether Sergeant Direzza *perceived* that Mr. Waterhouse was holding a wooden rod.[1] But it is undisputed that Agent Williams thought Mr. Waterhouse "wanted to kill him," that Sergeant Direzza "feared a struggle in the burning basement could be deadly," and that the sergeant "feared for the safety of the

---

[1] Sergeant Direzza testified that Mr. Waterhouse had a "stick or a club or a staff, basically a wooden rod that was about four or five-feet long in his hands" when he ran out of the bedroom. Joint App. at 731. But he "conceded for the purposes of summary judgment and a qualified immunity analysis that [Mr.] Waterhouse was not armed" in that moment. Aplee. Br. at 9. Although Sergeant Direzza still maintains that he *perceived* that Mr. Waterhouse was holding a wooden rod when he ran toward him, and the Estate disputes this fact, we need not resolve this dispute. As we will discuss, Sergeant Direzza's use of lethal force was objectively reasonable, regardless.

officers fleeing," since the burning stairs were the only way out. Joint App. at 1061–62.

To assist the reader in understanding the situation, we have inserted a not-to-scale diagram depicting the basement scene after the shooting. It was created by the Critical Incident Response Team. The Estate does not challenge its accuracy or contest Sergeant Direzza's additions (noted with asterisks).



The officers had little time to react. Agent Williams testified that he had "[l]ess than one second" to decide what to do. *Id.* at 550. Sergeant Direzza likewise

testified that he had "less than a second" to decide, because the "door flew open," "he was charging out at me essentially immediately," and "then there's just the — the time to cover a 5- or 6-feet distance by somebody who's charging at you." *Id.* at 769–70. And Sergeant Ebeling, who had started to ascend before Mr. Waterhouse burst out, said he had reached only the fourth stair when he heard gunshots.

As Mr. Waterhouse was running toward the two officers, Agent Williams fired his beanbag shotgun twice, and one beanbag hit Mr. Waterhouse in the lower-left abdomen. Agent Williams believes that the impact caused him to spin counterclockwise. Sergeant Direzza fired his pistol three times, with one bullet striking Mr. Waterhouse in the right-lower back. The autopsy report indicates that the bullet exited through his left chest, with a trajectory of "[b]ack to front, up, and right to left." *Id.* at 586. There is no recording to provide the precise sequence and timing of the five shots. Sergeant Direzza testified that he fired "as fast as [he] could." *Id.* at 772. Another officer, who was upstairs by then, said that the span of time between the first shot and the last (including both the pistol and the beanbag shots) was "no more than three seconds." *Id.* at 459.

After the shooting, Sergeant Ebeling and others carried Mr. Waterhouse out of the burning home. When he got back outside he announced "shots fired" on the radio. *Id.* at 1061 (internal quotation marks omitted). According to time stamps on the dispatch records, he made that announcement less than two minutes after Mr. Waterhouse was reported to be holding "a large stick." *Id.* at 343. Mr. Waterhouse died from the gunshot wound.

### B.    Court Proceedings

On April 6, 2021, the Estate (through its personal representative, Ms. Lopez) and Amber Waterhouse (Mr. Waterhouse's daughter) filed a complaint against Sergeant Direzza and the City of Lakewood, Colorado. The complaint asserted three claims: (1) a Fourth Amendment excessive-force claim under 42 U.S.C. § 1983 by the Estate against both defendants, (2) a municipal-liability claim under § 1983 by both plaintiffs against the City of Lakewood, and (3) a wrongful-death claim under Colorado law by Amber Waterhouse against Sergeant Direzza. The district court granted the City of Lakewood's motion to dismiss the municipal-liability claim, but it denied Sergeant Direzza's motion to dismiss the excessive-force and wrongful-death claims.

On October 18, 2023, the district court concluded that Sergeant Direzza was entitled to qualified immunity and granted him summary judgment on the Estate's excessive-force claim. Having entered judgment on the sole remaining federal claim, the district court declined to exercise supplemental jurisdiction over Ms. Waterhouse's state-law wrongful-death claim and dismissed it without prejudice.

The Estate and Ms. Waterhouse timely appealed. They do not challenge the district court's dismissal of the municipal-liability claim.

## II.    DISCUSSION

"We review a district court's grant of summary judgment based on qualified immunity de novo." *Sanchez v. Guzman*, 105 F.4th 1285, 1292 (10th Cir. 2024). Consequently, we do not concern ourselves with whether the district court erred in

assessing the evidence, or whether an erroneous assessment was prejudicial to the Estate. Our task is to examine the evidence afresh.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Flores v. Henderson*, 101 F.4th 1185, 1192 (10th Cir. 2024) (internal quotation marks omitted).

Also, our review at the summary-judgment stage is somewhat modified when a defendant asserts a qualified-immunity defense. That "affirmative defense creates a presumption that the defendant is immune from suit." *Sanchez*, 105 F.4th at 1292 (brackets and internal quotation marks omitted). "To overcome this presumption, the plaintiffs bear the burden of showing that (1) the officers' alleged conduct violated a constitutional right, and (2) that right was clearly established at the time of the violation, such that every reasonable official would have understood that such conduct constituted a violation of that right." *Id.* (brackets and internal quotation marks omitted).

### A.    Compliance with the Fourth Amendment

Apprehending a suspect "by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The reasonableness inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. And the reasonableness calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

In *Graham* the Supreme Court identified three nonexclusive factors for determining whether a particular use of force was excessive: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

From these fundamental propositions, we draw several conclusions that substantially limit the relevance of some of the Estate's factual arguments. First, the Estate emphasizes that Mr. Waterhouse was not armed when he was shot. But one need not be armed to pose a serious threat to the lives of others. The fact that Mr. Waterhouse "was unarmed is not outcome determinative." *Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th Cir. 2005). "We have previously rejected the argument that only a suspect armed with a deadly weapon poses a physical threat sufficient to justify use of deadly force." *Id.*

Second, the Estate contends that at the time he was shot, Mr. Waterhouse was not charging at the officers but was rushing to go up the stairs. At the very least, it says, there was a dispute of fact regarding where he was headed. But the issue is not

Page 11

where he was headed, but whether a reasonable officer could think that Mr. Waterhouse was charging at the officers. *See Graham*, 490 U.S. at 396 (explaining that reasonableness "must be judged from the perspective of a reasonable officer on the scene"). The perspective of the officers is what counts. And when, as here, an error in a split-second decision could be fatal to the officers, courts *must* recognize that the test of reasonableness is not what one would conclude after studied contemplation. *See id.*

We now turn to an examination of the *Graham* factors, although not in the same order as they were listed by the Supreme Court.

### 1.    *Severity of the crime*

Although the Estate asserts that the officers originally entered the home "to investigate property damage," it concedes that "Mr. Waterhouse started a fire at some point after the officers entered." Aplt. Br. at 28. And though the Estate argues that the officers could have retreated because the fire department was contacted, that does not change the fact that a reasonable officer could certainly have believed that Mr. Waterhouse had committed a dangerous felony.[2] Because he lit the house on fire while officers were inside, this factor clearly favors Sergeant Direzza. *See Ramirez v. Guadarrama*, 3 F.4th 129, 134–36 (5th Cir. 2021) (concluding that officers' use of

---

[2] *See* Colo. Rev. Stat. § 18-4-102 ("(1) A person who knowingly sets fire to, burns, causes to be burned, or by the use of any explosive damages or destroys, or causes to be damaged or destroyed, any building or occupied structure of another without his consent commits first degree arson. (2) First degree arson is a class 3 felony if the arson is of an occupied structure, and it is a class 4 felony if the arson is of a building.").

force was reasonable, in part because "the severity of the threatened crime, i.e., felony arson, was considerable"); *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) ("[O]ur binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent.").

## 2.    *Resisting or evading arrest*

The Estate argues that the "third" *Graham* factor is "easy" because "the extent of Mr. Waterhouse's compliance [with commands] is disputed." Aplt. Br. at 34 (original brackets omitted). It relies on testimony from Agent Zachary Cook, who, observing the scene through the basement window, said it appeared that Mr. Waterhouse was just getting ready to go up the stairs. It harnesses this observation to suggest that Mr. Waterhouse was complying with orders. We beg to differ.

From the perspective of the officers in the basement, it reasonably appeared that Mr. Waterhouse was unwilling to submit to authority. He had resisted their entreaties to surrender for nearly two hours, in language that was anything but polite. When he burst out of the bedroom he gave no indication that he was now willing to comply. Rushing up the stairs would have suggested escape more than surrender. In any event, the inferences of another officer, viewing the events from a significantly different perspective, do not diminish the reasonableness of the view of the defendant officer. *See Est. of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1065 (10th Cir. 2021) (explaining that the proper focus is on "whether a reasonable officer *in [the defendant's] position* would have believed [that the suspect] was . . . dangerous");

*Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1263 n.4 (10th Cir. 2008) (that another officer "held his fire" did not support the argument that the defendant's use of deadly force was unreasonable, because the suspect "turned and moved toward" the defendant, not the other officer). And a "reasonable officer" in Sergeant Direzza's position "*could have perceived* from Mr. [Waterhouse's] actions not only that his intentions were hostile, but also that they were malevolent." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 770 (10th Cir. 2021) (emphasis added); *see Kohorst v. Smith*, 968 F.3d 871, 875, 878 (8th Cir. 2020) (given that the suspect refused to put his hands behind his back, "a reasonable officer in Smith's position *could have perceived* [him] to be resisting arrest and could have feared for his safety" (emphasis added)); *Marquez v. Gutierrez*, 322 F.3d 689, 693 (9th Cir. 2003) ("The scenario may look different when gauged against the 20/20 vision of hindsight, but we must look at the situation as a reasonable officer in Gutierrez's position *could have perceived* it." (emphasis added and internal quotation marks omitted)).

### 3.    *Immediate threat*

"Although the first and third [*Graham*] factors can be particularly significant in a specific case, the second factor—whether there is an immediate threat to safety—is undoubtedly the most important factor in determining the objective reasonableness of an officer's use of force." *Est. of Valverde*, 967 F.3d at 1060–61 (ellipses, footnote, and internal quotation marks omitted). When the suspect is carrying a deadly weapon, this court has identified four nonexclusive factors to aid in assessing the degree of the threat: "(1) whether the officers ordered the suspect to

Page 14

drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Est. of Larsen*, 511 F.3d at 1260. Even though the first two factors do not apply when the danger from the suspect does not arise from his possession of a weapon, the factors, taken together, instruct us that when the suspect is unarmed we should consider (although not exclusively) the evidence indicating whether or not the suspect (1) was exhibiting compliance or hostility toward the authority of the officers, (2) was exhibiting a willingness to use violence against the officers or others, and (3) was capable of causing and in a position to cause imminent severe bodily harm.

The factual setting in one of our unpublished opinions, in which all three factors strongly favored the officer, is illustrative and instructive. In *Easter v. Cramer* a game warden tackled a fleeing unarmed suspect for whom an arrest warrant had issued, they rolled into a pond, the suspect shoved the officer underwater, and the officer shot him. *See* 785 F. App'x 602, 604, 608 (10th Cir. 2019). Even though the suspect was unarmed, the officer "remained in a vulnerable position, and a reasonable officer would have reason to believe that [the suspect] might use the water to drown him if the altercation continued." *Id.* at 608. The court reiterated that a suspect need not be "'armed with a deadly weapon [to] pose[] a physical threat sufficient to justify use of deadly force.'" *Id.* n.4 (quoting *Blossom*, 429 F.3d at 968).

Page 15

And it reasoned that "[t]his principle is especially true in a case like this one where a body of water could be used to kill or seriously injure an officer." *Id.*

In this case, too, by these measures the immediate-threat factor weighs heavily against Mr. Waterhouse. As just noted, for almost two hours Mr. Waterhouse had aggressively rejected the overtures by the officers to surrender to their custody. He had set a fire while officers were inside and slammed a wooden rod into the wall. When he left the bedroom, he did nothing to indicate that he was submitting to authority. He rushed out.

The perception of a threat of imminent severe bodily harm was more than reasonable. If Mr. Waterhouse attacked an officer and engaged him in any significant struggle, the smoke and fire might well have killed him. Particularly in light of Mr. Waterhouse's prior destructive and violent behavior and expressions of hostility to the police, his bursting out of the bedroom and running toward Sergeant Direzza from six-to-ten-feet away would naturally look like a mortal threat.

And, perhaps most significantly, the circumstances could not have been less conducive to studied contemplation. Sergeant Direzza was in a very dangerous situation regardless of the conduct of Mr. Waterhouse. Fire and smoke had already forced the rapid evacuation of the basement by the other officers. Then a deranged and hostile Mr. Waterhouse unexpectedly barged out of the bedroom and began running in the officers' direction from less than ten feet away. Sergeant Direzza could not have had much more than a second to assess the situation and react.

The Estate contends that Sergeant Direzza had ample time to assess the situation. It relies on a portion of Sergeant Direzza's deposition testimony where he confirmed that he "had enough time to conclusively determine that [Mr. Waterhouse] was armed." Joint. App. at 773. But whether Mr. Waterhouse was carrying a weapon was only one data point to be considered. As previously noted, Mr. Waterhouse could constitute a mortal danger even if he was not armed, because a simple physical struggle in that environment could be a matter of life or death.

The Estate also argues that there was no threat because Mr. Waterhouse was just seeking to go up the stairwell. But the diagram of the basement (shown above) clearly establishes that Mr. Waterhouse had to first head toward the officers if he intended to go up the stairwell. Indeed, the officer looking through the basement window acknowledged this point when he said that he thought Mr. Waterhouse would "buttonhook" (that is, double back sharply) before going up the stairs.[3] *See* New Oxford American Dictionary 239 (3d ed. 2010) (defining *buttonhook* as "double back sharply"). The physical evidence also establishes that Mr. Waterhouse was heading toward the officers: it shows that Sergeant Direzza fired his pistol directly toward the bedroom. One bullet was found in the bedroom doorway, one bullet hole was discovered in the mattress in the bedroom, and one likely bullet defect (that is,

---

[3] The Estate points to deposition testimony from Agent Cook, who, observing the scene through the basement window, had seen Mr. Waterhouse "rip[] open" the door and come running out of the bedroom. Joint App. at 921. When asked if "[i]t looked to you like [Mr. Waterhouse] was just getting ready to run up the stairs," he replied, "Yes." *Id.* at 918. But he went on to say, "I thought that he was *getting ready to buttonhook* and go up the staircase." *Id.* (emphasis added).

damage caused by a bullet) was found in a bedroom chair. No bullet defects were found on the central wall of the basement, between the bedroom door and the stairs.

The Estate next claims that Mr. Waterhouse could not have been a threat because he was shot in the back. But when an officer fires his gun to protect against a mortal threat, the officer is not required to stop and take inventory after each shot. *See Est. of Valverde*, 967 F.3d at 1066 (where the officer started firing less than a second after the suspect drew his gun and stopped firing within a second of when he started, "his use of his weapon was not an exercise in sharpshooting in controlled circumstances" and "[h]e could not be sure that his shots would disable [the suspect]," so "it was hardly unreasonable for [him] to wait a second (literally) after first firing his gun before reassessing the situation"). The district court carefully explained why the only reasonable explanation for Mr. Waterhouse's back to be facing Sergeant Direzza is that one of Agent Williams's beanbag shots—which struck Mr. Waterhouse in the lower-left abdomen (and left a large, purple abrasion)—caused his body to rotate.[4] But regardless of what caused Mr. Waterhouse to turn, Sergeant

_____

[4] The autopsy report said that the bullet entered Mr. Waterhouse's right-lower back and exited through his left chest, with a trajectory of "[b]ack to front, up, and right to left." Joint App. at 586. The "only reasonable explanation" for such a trajectory, according to the district court, was that:

> [T]he non-lethal beanbag shot by Agent Williams hit Mr. Waterhouse in the lower left abdomen, causing Mr. Waterhouse to twist toward his left (which was toward the stairwell) as he fell. . . . As he was falling, one of Defendant's three bullets, shot over the space of no more than three seconds, hit Mr. Waterhouse in the back. . . . It does not take an expert witness to explain that a bullet shot by Defendant at a *vertical* Mr.

Direzza would have had only an instant to react to the new situation. Sergeant

Direzza's decision to continue firing is the type of split-second judgment, made in

"tense, uncertain, and rapidly evolving" circumstances, "that [courts] do not like to

second-guess using the 20/20 hindsight found in the comfort of a judge's chambers."

*Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1318 (10th Cir. 2009) (internal quotation

marks omitted). Sergeant Direzza's use of deadly force was objectively reasonable.

### B.    Clearly Established Law

Finally, although we have held that there was no Fourth Amendment violation,

we say a few words about the second prong of qualified immunity—whether a

violation was clearly established.

Law is clearly established "if a plaintiff (1) identifies an on-point Supreme

Court or published Tenth Circuit decision or (2) shows the clearly established weight

of authority from other courts has found the law to be as the plaintiff maintains."

*Flores*, 101 F.4th at 1197 (brackets, ellipses, and internal quotation marks omitted).

"An officer cannot be said to have violated a clearly established right unless the

right's contours were sufficiently definite that any reasonable official in the

---

Waterhouse running for the stairs would not have traveled from the low
back to the mid-chest.

*Est. of Waterhouse v. Direzza*, No. 21-CV-00982-KAS, 2023 WL 6878401, at *11
(D. Colo. Oct. 18, 2023). Indeed, even if Sergeant Direzza had been crouching when
he fired, it is difficult to see how the bullet could have entered Mr. Waterhouse's
right-lower back and exited through his left chest if Mr. Waterhouse had been
running *upright*, not spinning and falling. The Estate offers no contrary explanation
for the bullet's trajectory.

defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (internal quotation marks omitted).

The Estate relies on *King v. Hill*, an unpublished Tenth Circuit decision, which concluded that "the law was clearly established that a law enforcement officer may not use deadly force to seize an unarmed person who is not posing any threat to the officer or others." 615 F. App'x 470, 477 (10th Cir. 2015). Although that decision was not precedential, this circuit later endorsed a similar principle in a published decision. *See Finch v. Rapp*, 38 F.4th 1234, 1238, 1242–43 (10th Cir. 2022) (explaining that Tenth Circuit cases decided before December 28, 2017 "establish that an officer, even when responding to a dangerous reported situation, may not shoot an unarmed and unthreatening suspect").

But these decisions have no application here. While Mr. Waterhouse was unarmed, he was not *unthreatening*. He was running toward Sergeant Direzza from less than ten feet away in a fiery basement. None of our cases forbid officers from using lethal force in such a situation. "[I]t is clearly established that officers may act under exigent circumstances when they reasonably see an immediate need to protect the lives or safety of themselves or others." *Flores*, 101 F.4th at 1199 (internal quotation marks omitted).

Sergeant Direzza was in an extremely "vulnerable position" in the smoke-filled, fiery basement. *Easter*, 785 F. App'x at 608. A reasonable officer would have feared Mr. Waterhouse's attacking him or other officers, thereby trapping the officers in the burning basement and presenting a grave risk of injury or death. In short, the

Page 20

hazardous environment that Mr. Waterhouse created was a key component of the risk.

We conclude that Sergeant Direzza is entitled to qualified immunity.

### C.    Wrongful-Death Claim

Ms. Waterhouse requests that we reverse the district court's dismissal of her state-law wrongful-death claim if, but only if, we reverse its summary judgment on the Estate's federal-law excessive-force claim, "since the latter dismissal depended on the former." Aplt. Br. at 38. Because we affirm the district court's summary judgment, we also affirm its dismissal of the wrongful-death claim.

### III.    CONCLUSION

We **AFFIRM** the district court's summary judgment, as well as its dismissal of the wrongful-death claim.