**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 12, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MARIE GASTON, Surviving Parent
and Administratrix of the Estate of
Jeffrey Ray Belden,

     Plaintiff - Appellee,

v.

WARREN PLOEGER; GLEN
LEITCH; STEVE ROBERTS,
individually and as County
Commissioners of Brown County,
Kansas; LAMAR SHOEMAKER,
individually and as Sheriff of Brown
County, Kansas; BRETT
HOLLISTER,

     Defendants - Appellants,

        and

JOHN DOES, unknown and
unidentified employee(s) of Brown
County, Kansas; JANE DOES,
unknown and unidentified employee(s)
of Brown County, Kansas,

     Defendants.

No. 05-3461
(D.C. No. 04-CV-2368-DJW)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Before **KELLY**, **McCONNELL**, and **HOLMES**, Circuit Judges.

Jeffrey Ray Belden committed suicide on August 14, 2002, while he was incarcerated in Brown County, Kansas. Thereafter, Plaintiff-Appellee Marie Gaston brought this lawsuit on his behalf asserting, inter alia, a 42 U.S.C. § 1983 claim that various Brown County officials were deliberately indifferent to the risk that Mr. Belden would commit suicide. The defendants moved for summary judgment on the basis of qualified immunity; the magistrate judge to whom the case was assigned granted the motion with respect to the § 1983 claims against County Commissioners Warren Ploeger, Glen Leitch, and Steve Roberts but denied the motion with respect to the § 1983 claims against Sheriff Lamar Shoemaker, Sergeant Brett Hollister, and Officer Brandon Roberts. Exercising appellate jurisdiction pursuant to 28 U.S.C. § 1291, we conclude that the evidence cannot establish a constitutional violation. Accordingly, we reverse and remand.

## Background

The question raised in this appeal is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the [defendants'] conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). Thus, the facts recounted below are taken from the record and presented in the light most favorable to Ms. Gaston. See Thomas v. Wichita Coca-Cola

- 2 -

Bottling Co., 968 F.2d 1022, 1024 (10th Cir. 1992) (noting that, when facts are in dispute, the nonmoving party may not simply rest on the pleadings but must identify "sufficient evidence (pertinent to the material issue) . . . by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein").

I.     Mr. Belden's Suicide

On June 26, 2002, Mr. Belden was incarcerated in the Brown County Jail awaiting trial on a charge of possession of methamphetamine with intent to sell. [II Aplt. App. at 335.] For the first six weeks of his incarceration, Mr. Belden was a well-behaved inmate. [Id. at 338.] Then, on or about August 14, Mr. Belden received a letter from his significant other, Jennifer Renz.[1] [Id. at 335.] Sergeant Hollister, the jail administrator, was aware that Mr. Belden had received this letter. [I Aplt. App. at 99.] He also became aware that Mr. Belden had altered his cell window to facilitate the receipt of contraband. [II Aplt. App. at 335.] Because Mr. Belden had tampered with the window, Sergeant Hollister decided to move him to a different cell. [Id.]

Mr. Belden made it clear to Sergeant Hollister that he did not want to be moved. First, Mr. Belden complained about his new cellmates. [Aplt. Br. at 5.] Then, when Sergeant Hollister moved Mr. Belden to a single-person cell, he complained that his new cell did not have a working television. [Id. at 6.] When

_____

[1] The magistrate judge referred to Ms. Renz as Mr. Belden's fianceé. The briefs refer to her as his girlfriend. The exact status of their relationship is not material to this appeal.

- 3 -

Sergeant Hollister refused to move Mr. Belden from his television-less, single-person cell, Mr. Belden used a piece of fruit to plug the toilet. [II Aplt. App. at 336.] Sergeant Hollister then moved him to a different single-person cell. [Id.]

At 4:00 p.m., Officer Roberts came on duty and was told that Mr. Belden was in a single-person cell for disciplinary reasons. [Id.] Shortly thereafter, Officer Roberts began serving dinner to the inmates. At about 5:30 p.m., Mr. Belden came out of his cell to get his dinner, threw his iced tea down the hallway, and refused to return to his cell. [Id.] Officer Roberts was the only officer on duty at the jail, so he summoned Brown County Deputy Doug Brammer to assist him in dealing with Mr. Belden. [Id.] When Officer Roberts and Deputy Brammer threatened Mr. Belden with pepper spray, he went back into his cell. [Id.]

At 6:40 p.m., Officer Roberts conducted a routine check of the cells, and he noticed that Mr. Belden had placed paper over his cell window. [Id.] Although the jail's practice permitted prisoners to obstruct their cell window temporarily (usually to afford them privacy when using the toilet), Officer Roberts told Mr. Belden to remove the paper. [Id.] Mr. Belden refused and threatened to harm Officer Roberts if he entered the cell. [Id.] Officer Roberts testified that he considered this behavior to be out of character for Mr. Belden. [Id.]

Concerned about Mr. Belden's insubordination, Officer Roberts telephoned Sergeant Hollister at home. [Id.] Sergeant Hollister instructed Officer Roberts to

- 4 -

summon a deputy to assist him, enter Mr. Belden's cell to remove the paper, and move Mr. Belden to Cell 14. [Id.] Cell 14 is the jail's suicide watch cell, but it is also used to house inmates who need frequent observation for other reasons, such as intoxication or injury. [I Aplt. App. at 99.] Officer Roberts was aware that Cell 14 was used as a suicide watch cell and that jail procedure dictated that inmates in Cell 14 were to be observed more frequently than prisoners in other cells. [II Aplt. App. at 336.]

After speaking with Sergeant Hollister, Officer Roberts claims that he immediately contacted dispatch to request assistance, but his jail log does not contain a notation that he did so. [Id. at 337.][2] Deputy Brammer testified that he was on duty at the time and did not recall hearing that Officer Roberts had requested assistance. [Id.] In any case, Officer Roberts spent the next hour supervising the male inmates' recreation period and one inmate's family visit. [I Aplt. App. at 120.] During this time, he passed by Mr. Belden's cell frequently and spoke with him on several occasions. [Id.]

At approximately 7:45 p.m., Officer Roberts conducted another cell check. [II Aplt. App. at 337.] Mr. Belden's window was still obstructed, and Officer Roberts again instructed him to remove the paper. [Id.] Mr. Belden replied, "Fuck off." [Id.] Although the obstruction had been in place for over an hour,

---

[2] Pursuant to jail procedure, if Officer Roberts did contact dispatch to request assistance, he should have recorded his action in the jail log. [Id.]

Officer Roberts did not follow up with dispatch to inquire about whether any officers were coming to assist him, and he did not telephone Sergeant Hollister with an update on Mr. Belden's behavior. [Id. at 338.] Likewise, Sergeant Hollister did not phone Officer Roberts to determine whether his instructions had been followed. [Id.]

Shortly after 8:00 p.m., Officer Roberts let inmate Anthony Lawson out of his cell to do laundry. [I Aplt. App. at 122.] Frustrated that no deputy had yet arrived to assist him in removing the paper from Mr. Belden's cell window, Officer Roberts decided to have Mr. Lawson assist him in removing the obstruction from Mr. Belden's cell window. [Id. at 122-24.] Mr. Lawson was an inmate trusty whom Officer Roberts trusted, and he was also friendly with Mr. Belden. [Id. at 124.]

When Mr. Lawson opened Mr. Belden's cell door, he found Mr. Belden hanging by a sheet from the door handle. [Id.] Officer Roberts immediately summoned an ambulance. [Id.] Deputy Brammer, who had been upstairs in the sheriff's office doing paperwork for approximately fifteen minutes, heard the call and went down to the jail to assist Officer Roberts. [Id.] He estimated that Mr. Belden had been dead for about half an hour when he arrived on the scene at 8:18 p.m. [II Aplt. App. at 286.]

After the suicide, Mr. Belden's former cellmates informed jail staff that he had spoken of suicide on several occasions. [Id. at 335.] In the days leading up to

his death, Mr. Belden had given away his food, rocked back and forth on his bed for extended periods of time, and tied his shoelaces together to see whether they would support his body weight. [Id.] Apparently, Mr. Belden's fellow inmates believed that this behavior was simply an effort to get attention. In any case, it is undisputed that they did not report their observations to anyone in the jail before Mr. Belden committed suicide. [Id.]

II.    Training and Supervision

Both Sheriff Shoemaker and Sergeant Hollister have undergone suicide prevention training, which has taught them, among other things, how to identify inmates with suicidal tendencies. [Id.; see also Aplee. Br. at 48 (listing the numerous training programs Sheriff Shoemaker has attended).] According to Sergeant Hollister, his training taught him that a sudden change in an inmate's behavior can indicate an increased risk of suicide. [II Aplt. App. at 336.] However, he considered an inmate covering his cell window to be a disciplinary issue rather than a suicide warning sign. [I Aplt. App. at 96.] Sheriff Shoemaker concurred. [Id. at 141.]

At the time of Mr. Belden's suicide, Officer Roberts had not received any formal suicide prevention training despite having worked as a corrections officer for the Brown County Sheriff's Department for eighteen months. [Id. at 111-13.] Generally, Brown County Jail officers are offered the opportunity to attend a corrections class that includes a suicide prevention component after they have

been employed for a year. [Id. at 148.]  However, Officer Roberts testified that he had only received on-the-job training through his interactions with fellow officers. [Id. at 112-13.]  He knew that depression was a suicide warning sign, and he testified that he relied on his common sense in detecting and preventing suicide attempts. [Id. at 113.]

III.    Brown County Jail Policies and Procedures

As noted, jail officials generally allow inmates to cover their cell windows for short periods of time. [See Aplt. Br. at 19.]  However, Officer Roberts understood that it was important for correctional officers to have an unobstructed view of the inside of the cells in order to monitor the inmates and make sure they did not harm themselves or others. [I Aplt. App. at 120-21.]  If an inmate refused to remove a window covering, jail policy dictated that the correctional officers should forcibly remove it. [Id.; see also id. at 96; id. at 141.]  The policy mandated that at least two officers would enter a cell to resolve disciplinary issues such as an inmate's failure to remove an obstruction from the cell window. [Id. at 96.]  Nevertheless, the policy recognized that it was often impractical to enter a cell immediately, and Sheriff Shoemaker testified that if an officer is busy, other inmates are out of their cells, and the officer is waiting for assistance, it would not be unreasonable for a window to remain covered for as long as it was covered in this case. [II Aplt. App. at 338.]

The jail also had procedures for dealing with known suicide risks. [Id. at

339.] If an inmate demonstrated any indication of an intention to harm himself, officers would immediately summon Kanza Mental Health to the jail, and Kanza would evaluate the inmate. [Id.] Depending on the specific circumstances of the case, the inmate could be segregated and monitored.[3] [Id.] As mentioned, Cell 14 was used as a suicide watch cell at the Brown County Jail. [Id. at 337.]

IV.    Procedural History

Ms. Gaston brought this lawsuit as the survivor of Mr. Belden and as the administratrix of his estate, alleging claims pursuant to 42 U.S.C. § 1983 and Kansas state tort law. After the parties consented to the exercise of jurisdiction by a United States Magistrate Judge, the defendants moved for summary judgment on the basis of qualified immunity. The magistrate judge granted summary judgment to the County Commissioners and to Sheriff Shoemaker in his official capacity on Ms. Gaston's § 1983 claim but denied them summary judgment on the state law claims. He further denied summary judgment on all claims to Sheriff Shoemaker in his individual capacity, Sergeant Hollister, and Officer Roberts. Sheriff Shoemaker and Sergeant Hollister filed a timely notice of appeal.[4]

---

[3] Notably, when Mr. Belden arrived at the hospital, the emergency room physician was told that he had been placed on half-hour cell check. [Id. at 338.]

[4] As will be discussed, infra, Officer Roberts did not properly appeal the denial of the summary judgment motion, so we cannot consider whether he is entitled to qualified immunity.

Discussion

This appeal challenges the denial of a motion for summary judgment based on qualified immunity. When a defendant has asserted qualified immunity, the burden shifts to the plaintiff to establish: (1) that the defendant violated the plaintiff's constitutional right, and (2) that, at the time of the incident, it was clearly established that the defendant's conduct amounted to a constitutional violation. Saucier, 533 U.S. at 201; Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc). The court must view the evidence in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. See Fuerschbach v. Sw. Airlines Co., 439 F.3d 1197, 1207 (10th Cir. 2006). It then makes two legal determinations: (1) whether the facts state a constitutional violation, and (2) whether it was clearly established that the defendant's conducted violated the constitutional right. See Blossom v. Yarbrough, 429 F.3d 963, 966 (10th Cir. 2005).

Here, the appellants concede that a jailer violates the Fourteenth Amendment if he is deliberately indifferent to a known risk that a pre-trial detainee will commit suicide, see Aplt. Br. at 23-24 (citing Barrie v. Grand County, 119 F.3d 862, 866 (10th Cir. 1997), and Frohmader v. Wayne, 958 F.2d 1024, 1028 (10th Cir. 1992)), and they do not challenge the district court's conclusion that the law was clearly established at the time of Mr. Belden's death. However, they contend that the facts of this case, even when viewed in the light

- 10 -

most favorable to Ms. Gaston, fail to establish a constitutional violation. Id. at 27, 30. We review this legal question de novo. Blossom, 429 F.3d at 967.

I.    Jurisdiction

At the outset, we must evaluate Ms. Gaston's contention that we lack jurisdiction to hear this appeal. "Generally, [the] denial of summary judgment is not immediately appealable." Id. at 966. As Ms. Gaston concedes, the denial of qualified immunity "is subject to immediate appeal when the defendant is a public official asserting qualified immunity and the issue appealed is one of law." Id.; see also Martinez v. Carr, —F.3d—, 2007 WL 901922, at *2 (10th Cir. 2007); Aplee. Br. at 1. She argues, however, that this case is not "proper as an interlocutory appeal since Appellants have not postured the issue(s) of appeal as based on qualified immunity." Id. In other words, she asks us to hold that we lack jurisdiction because the words "qualified immunity" do not appear anywhere in the two issues presented for review in the appellants' brief. Id. at 2.

Ms. Gaston does not point to a single case requiring appellants to use the words "qualified immunity" in their statement of the issues. Moreover, the appellants' statement of the issues (not to mention their brief as a whole) makes clear that they are pressing a legal question related to the denial of qualified immunity. Additionally, their notice of appeal specifically states that they are appealing "a Memorandum and Order denying [their] claims for qualified immunity . . . ." R. Doc. 42 at 1. The appellants contend that, as a matter of law,

- 11 -

the facts in the record do not establish a constitutional violation; if this is true, they are necessarily entitled to qualified immunity. See Saucier, 533 U.S. at 201. Without doubt, then, this appeal raises a legal question related to the denial of qualified immunity, and we have jurisdiction pursuant to 28 U.S.C. § 1291. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).

II.     Officer Roberts's Attempted Appeal

Having held that we have jurisdiction over the appeal, we must now determine whether Officer Brandon Roberts is rightly before us. The notice of appeal, timely filed on December 1, 2005, reads as follows:

> Notice is hereby given that Defendants Warren Ploeger, Glen Leitch, Steve Roberts, County Commissioners of Brown County, Kansas, Lamar Shoemaker and Brett Hollister ("Defendants"), in the above-referenced matter, hereby appeal to the United States Court of Appeals for the Tenth Circuit from a Memorandum and Order denying Defendants' claims for qualified immunity entered in this action on the 17th day of November, 2005.

R. Doc. 42 at 1. Officer Brandon Roberts's name does not appear at all in the text or the caption of the notice of appeal. See id.

Pursuant to Fed. R. App. P. 3(c)(1)(A), a notice of appeal must "specify the party or parties taking the appeal by naming each one in the caption or body of the notice . . . ." In Torres v. Oakland Scavenger Co., the Supreme Court held that "[t]he failure to name a party in the notice of appeal is more than excusable 'informality'; it constitutes a failure of that party to appeal." 487 U.S. 312, 314 (1988). Following Torres, the Federal Rules of Appellate Procedure were

amended to make clear that "[a]n appeal must not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice." Fed. R. App. P. 3(c)(4). Moreover, the amended Rule permits "an attorney representing more than one party [to] describe those parties with such terms as 'all plaintiffs,' 'the defendants,' 'the plaintiffs A, B, et al.,' or 'all defendants except X.'" Id. R. 3(c)(1)(A).

In light of these changes, the dispositive question is whether the notice of appeal has provided fair notice of the parties that intend to appeal the lower court's decision. See Dodger's Bar & Grill, Inc. v. Johnson County Bd. of County Comm'rs, 32 F.3d 1436, 1440-41 (10th Cir. 1994). We have held that the jurisdictional nature of Rule 3(c) prevents us from considering an appeal by a party whose intent to appeal is not clear from the notice even when the omission of the party is inadvertent and the opposing party has suffered no prejudice. See Twenty Mile Joint Venture, PND, Ltd. v. Comm'r of Internal Revenue, 200 F.3d 1268, 1274 (10th Cir. 1999). Accordingly, we have concluded that the omission of one party where others are mentioned by name is insufficient to indicate that the omitted party intended to appeal. See id. at 1273-74.

Here, both the caption and the body of the notice listed five of the original six defendants by name. Nothing in the notice even suggested that Officer Roberts intended to appeal the denial of summary judgment. In these circumstances, we have little difficulty concluding that the notice of appeal did

not provide fair notice that Officer Roberts intended to appeal. Therefore, we lack jurisdiction to consider whether Officer Roberts was entitled to summary judgment.[5] See id.

III.   Qualified Immunity

Although "neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners[, t]hey are, . . . responsible for taking reasonable measures to [e]nsure the safety of inmates." Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999) (internal citation omitted). Accordingly, a jailer violates the Eighth Amendment if he shows deliberate indifference to a convicted inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976); see also Farmer v. Brennan, 511 U.S. 825, 834 (1994). "Under the Fourteenth Amendment's due process clause, pretrial detainees . . . are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment." Frohmader, 958 F.2d at 1028; see also Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979).

Claims arising from a failure to prevent prisoner suicide "are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." Barrie, 119 F.3d at 866. Thus, a plaintiff bringing

_____

[5] Of course, Officer Roberts may again assert qualified immunity later in the proceedings. See Langley v. Adams County, 987 F.2d 1473, 1481 n.3 (10th Cir. 1993). Nothing we say here is meant to indicate any opinion about whether Officer Roberts is entitled to qualified immunity.

such a claim must prove that his jailer was "deliberately indifferent to a substantial risk of suicide." Id. at 869 (internal quotation marks omitted). "Deliberate indifference has objective and subjective components." Callahan v. Poppell, 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component of the test is met if the harm suffered was sufficiently serious. Id. Obviously, suicide satisfies this requirement. See Collins v. Seeman, 462 F.3d 757, 760 (7th Cir. 2006) ("[I]t goes without saying that suicide is a serious harm.").

The subjective component of the test requires a showing that the defendant acted with a culpable state of mind. In Farmer v. Brennan, the Supreme Court observed that the required mens rea lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other . . . ." 511 U.S. at 836. The Court then held that "a prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

The Court made clear that the defendant's knowledge of a substantial risk may be proven by circumstantial evidence, including evidence "that the risk was obvious." Id. at 842. However, the threshold for obviousness is very high. See, e.g., Perez v. Oakland County, 466 F.3d 416, 435-36 (6th Cir. 2006) (Griffin, J., concurring) ("Admittedly, it may have been unwise to credit Perez's

- 15 -

characterization of his state of mind and his explanation for discontinuing his medication, particularly in light of his history and his unmedicated state itself. . . . [However, i]f one fails to perceive a strong likelihood, one cannot then be deliberately indifferent to it."); Collins, 462 F.3d at 761 ("[A] request to see a crisis counselor . . . is not sufficient to put a defendant on notice that an inmate poses a substantial and imminent risk of suicide.").

A.    Sergeant Hollister

The magistrate judge denied Sergeant Hollister's motion for summary judgment because "the evidence presented raises a genuine issue of material fact regarding whether Plaintiff can establish . . . (1) whether Defendant Hollister . . . had knowledge of the specific risk that Belden would attempt to commit suicide; or (2) whether the evidence demonstrates that the risk of Belden committing suicide was so substantial or pervasive that knowledge by [Sergeant Hollister] can be inferred." II Aplt. App. at 346. He contends that the evidence in the record, viewed in the light most favorable to Ms. Gaston, cannot establish that he was deliberately indifferent to the risk that Mr. Belden would kill himself. We agree.

The magistrate judge relied on the following evidence in reaching the conclusion that Sergeant Hollister was not entitled to qualified immunity: (1) Mr. Belden's cellmates observed suicidal behavior and heard him discussing suicide; (2) Mr. Belden was not a disciplinary problem until the day of his death; (3) Mr. Belden received a letter from Ms. Renz on the day of his death and Sergeant

Hollister was aware of the receipt and contents of the letter; (4) Sergeant Hollister had training in detecting suicidal inmates; (5) Sergeant Hollister placed Mr. Belden in a single-person cell; (6) Mr. Belden plugged the toilet in his new cell; (7) Officer Roberts told Sergeant Hollister about Mr. Belden's continued insubordination between 4:00 and 6:40 p.m.; (8) Sergeant Hollister instructed Officer Roberts to remove the paper from Mr. Belden's cell window and transfer him to Cell 14; (9) Cell 14 was the suicide watch cell; and (10) Sergeant Hollister never followed-up with Officer Roberts to check on the situation with Mr. Belden. Id. at 346-49.

Much of this evidence has no bearing on whether Sergeant Hollister knew that Mr. Belden was suicidal. For example, the magistrate judge noted that there was no evidence that Sergeant Hollister was aware of the suicidal behavior observed by Mr. Belden's cellmates. Indeed, the inmates uniformly stated that they had not told any jail officials about their observations because they did not believe Mr. Belden was suicidal. Nevertheless, the magistrate judge believed that a jury could find that:

> [I]f the jailers had been properly monitoring the inmates, the jailers would have heard Belden talk about suicide, would have observed Belden give away his food, would have watched Belden repeatedly rock back and forth on his bed, and would have noticed Belden tying his shoelaces together to test the ability of the shoelaces to hold his body weight.

Id. at 350. This is hardly a proper inference to be drawn from the evidence

because it presumes that jailers have a constitutional duty to monitor inmates constantly. However, jailers are neither obligated nor able to watch every inmate at every minute of every day. The record is clear that Sergeant Hollister and his colleagues were not aware of the strange behavior described by Mr. Belden's cellmates. Under these circumstances, we would not permit a jury to infer that their failure to notice contributed to the "higher degree of fault than negligence" required for deliberate indifference. Berry v. City of Muskogee, 900 F.2d 1489, 1495 (10th Cir. 1990).

> With respect to the letter from Ms. Renz, Sergeant Hollister testified that:
>
> A.   He received a letter through the mail. It had been logged in by the jailers.
>
> Q.   That letter, did anyone at the jail look at that before they gave it to him?
>
> A.   Apparently so because the other dayshift jailer had mentioned it to me that . . . [Ms. Renz] wanted to know why he wouldn't come to the window when she honked.
>
> Q.   Did you ever observe that letter?
>
> A.   I don't remember.

I Aplt. App. at 99; see also II Aplt. App. at 269. The letter is not in the record, and nothing in the record further illuminates its contents. Nevertheless, the magistrate judge seemingly presumed that it was a "Dear John" letter. This is pure speculation that finds no support in the record. According to Deputy Brammer, Ms. Renz arrived at the hospital soon after Mr. Belden was taken there.

- 18 -

II Aplt. App. at 290. She told the emergency room physician that she had spoken with Mr. Belden the day before and that "[h]e told her that he loved her but did not make any suggestion that he might be particularly depressed or suicidal." Id. at 320. From this evidence, a jury would have no basis for inferring that there was anything amiss in Mr. Belden's relationship with Ms. Renz, let alone that the defendants were aware of it and deliberately indifferent to its effect on his mental state.

Sergeant Hollister admitted that Mr. Belden was generally a well-behaved inmate prior to August 14, 2002, and he agreed that a sudden shift in behavior can be a harbinger of suicide. I Aplt. App. at 98. However, he testified unequivocally that Mr. Belden's behavior did not dramatically change on the day he ended his life, and he viewed Mr. Belden's conduct as a disciplinary issue only. Id. at 98-99, 106. He explained: "I didn't know he was suicidal. . . . [H]e was just being uncooperative because he didn't want to be removed from that cell because I believe that that [sic] window had been altered to get contraband into the facility, so he didn't want to move because of possibly getting contraband." Id. at 106. Sergeant Hollister further testified that, in light of his drug history, Mr. Belden could be expected to be angry about being moved into a cell in which he would not be able to receive contraband. Id. Still, "[h]e wasn't that upset when I moved him. He argued the point. He said well I don't want to move. . . . He was never out of control. He did not yell or scream." Id.

Nevertheless, Sergeant Hollister later ordered Officer Roberts to move Mr. Belden to Cell 14, the suicide watch cell. Id. at 110. He also chose not to call Officer Roberts to verify that his orders had been carried out because "I didn't believe there would be a problem with him later. If he had a second jailer or an officer [with Officer Roberts] I didn't feel there was going to be a problem. He had already complied when two people were there." Id. at 103.

Certainly, a jury would be entitled to disbelieve Sergeant Hollister's testimony. However, the rigorous deliberate indifference standard requires knowledge that an inmate is suicidal or a risk that is so obvious and substantial that knowledge can be inferred. We would not permit a jury to infer knowledge simply from the fact that Sergeant Hollister instructed Officer Roberts to move Mr. Belden to Cell 14 because it is undisputed that Cell 14 was not solely used as a suicide watch cell. Moreover, the record contains no evidence that Mr. Belden's behavior was unusual for an inmate, especially an inmate who had been deprived of his access to contraband and moved to an isolated cell without a working television. Sergeant Hollister's suicide prevention training left him sensitive to clues of possible suicide, but there is no evidence that Mr. Belden exhibited any of these tendencies. He simply was not an obvious suicide risk. Because there is no evidence that Sergeant Hollister considered Mr. Belden suicidal, he could not have been deliberately indifferent to the risk of suicide. Accordingly, we conclude that he is entitled to qualified immunity.

B.      Sheriff Shoemaker

"A supervisor is not liable under section 1983 unless an affirmative link

exists between the constitutional deprivation and either the supervisor's personal

participation, his exercise of control or direction, or his failure to supervise."

Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988) (internal quotation marks

and alterations omitted).  Additionally, "[l]iability of a supervisor under § 1983

must be predicated on the supervisor's deliberate indifference, rather than mere

negligence." Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997).  Although

Sheriff Shoemaker did not personally participate in the events leading up to Mr.

Belden's suicide, the magistrate judge ruled that he could be liable for

inadequately supervising and training Sergeant Hollister and Officer Roberts.  II

Aplt. App. at 344-46.  On appeal, he argues that he is entitled to qualified

immunity because he was, at most, negligent.  Aplt. Br. at 32.  We agree.

As the Sheriff of Brown County, Sheriff Shoemaker is ultimately

responsible for the operation of the Brown County Jail and the conduct of its

employees.  Kan. Stat. Ann. § 19-811 (2005).  Thus, he is responsible for the

policy decision that jailers typically are not even offered a basic corrections class

until they have been employed for a year.  He is likewise accountable for the fact

that Officer Roberts was employed for eighteen months without undergoing any

formal training–let alone any suicide prevention training.  Furthermore, Sheriff

Shoemaker is responsible for leaving 23 inmates in the charge of one jailer for an

entire eight-hour shift, such that any disturbance would require the jailer to summon a road deputy who could take an hour or more to respond. Although we are sensitive to the constraints on budget and manpower faced by a small sheriff's department, these policies are troubling.

Yet, as the sheriff emphasizes, mere negligence is not enough; he must have been deliberately indifferent to the risk of prisoner suicide if he is to be liable under § 1983. Green, 108 F.3d at 1302. Thus, the record must contain evidence from which a jury could infer that Sheriff Shoemaker knew that his policies were insufficient to protect inmates from the risk of suicide. We have reviewed the record, and we find no such evidence. Sheriff Shoemaker has undergone extensive suicide prevention training by Kanza and other mental health and correctional agencies. See I Aplt. App. at 139-40. During his eight-year tenure, Mr. Belden was the first inmate to have taken his own life despite more than seventy-five prior suicide attempts. Id. at 140-41. Nothing in the sheriff's training or experience put him on notice that his policy of notifying Kanza at the first sign that an inmate was considering harming himself was inadequate.

While, in hindsight, it is clear that Sheriff Shoemaker could have better trained and supervised his subordinates, there is no evidence that he was deliberately indifferent to the risk of inmate suicide. Moreover, there is no evidence that Officer Roberts would have prevented Mr. Belden's suicide if he had been better trained; after all, Sergeant Hollister underwent several Kanza

training courses and testified that he did not believe that Mr. Belden was a suicide risk.  Id. at 106.  Accordingly, Sheriff Shoemaker is entitled to qualified immunity in his individual capacity.

REVERSED and REMANDED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge