**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 13, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MILDRED BAME, as personal
representative of the Estate of Derald
William Jorgensen, Jr.,

      Plaintiff - Appellee,

v.

IRON COUNTY; MARK O. GOWER,
individually and in his official capacity as
Sheriff of Iron County; CAPT. BRETT
ALLRED, individually and in his official
capacity; CPL. SHALAN SHAVER,

      Defendants – Appellants

and

DEPUTY JEFFREY MALCOM; DEPUTY
JEFF SORENSON; DEPUTY HENRY
JOSEPH ARMBRUSTER, JR.; DEPUTY
KERRIE TURRILL; DEPUTY BRENT
BURR; DEPUTY ANNA TEEPLES,

      Defendants.

No. 13-4044
(D.C. No. 2:10-CV-00890-BSJ)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

[*]This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
(Continued . . . )

Before **TYMKOVICH**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

Derald Jorgensen, Jr., committed suicide in the Iron County Jail while housed in a cell specifically designated for inmates on suicide watch. His personal representative, Mildred Bame, filed this 42 U.S.C. § 1983 action, claiming Eighth Amendment violations against a number of entities and individuals seeking to hold them responsible for his death. These entities and individuals moved for summary judgment based on qualified immunity. The district judge entered summary judgment as to all but (1) Iron County, (2) Sheriff Mark Gower, (3) Captain Brett Allred, the jail's commander, and (4) Corporal Shalon Shaver (collectively Defendants). Because we see no deliberate indifference on the part of any of the jailer defendants we reverse as to them. We also reverse as to the County because it cannot be liable absent an underlying constitutional violation by the individual defendants.

## I. BACKGROUND

A.    Jail's Suicide Prevention Policy and Procedures

The jail had a written suicide prevention policy in place at the time of Jorgensen's suicide. Under the policy, any officer may place an inmate on suicide watch if she is concerned the inmate might be at risk for committing suicide. However, once placed on

notation – (unpublished). *Id*.

suicide watch, an inmate cannot be returned to the general population until cleared by a mental health professional as safe.

The jail has two cells designated for inmates on suicide watch—B1 and B2. Both are located in the booking area, the highest traffic area of the jail. Before being placed in one of those cells, the inmate is searched, dressed in a suicide smock and given a suicide blanket.[1] The policy also requires the cell to be inspected for features which may pose a risk to a suicidal inmate, such as "**structural members** to which a ligature can be tied—bars, vent covers, grille, sprinkler heads, shower fixtures, light fixtures, bunk frames [and] bunk ladders." (Appellee's App'x Vol. II at 367.)

The policy requires observation of suicidal inmates more frequently than those in the general population, but it does not provide a specific frequency for observation.[2] That is because frequency is best determined on a case-by-case basis. The general population (pursuant to an unwritten policy) is normally checked once an hour except at night, when it is checked at 9:30 p.m. and then not until 11 p.m.[3]

---

[1] A suicide smock is a non-restrictive gown-like garment which cannot be rolled into a cord or torn. *See Gray v. Wakefield*, No. 3:CV-09-0979, 2013 WL 5491560, at *7 n.5 (M.D. Pa. Oct. 2, 2013) (unpublished); *see also Stanfill v. Talton*, 851 F. Supp. 2d 1346, 1356 n.3 (M.D. Ga. 2012). A suicide blanket is made out of heavy material which an inmate cannot (or should not be able to) tear or use to choke himself. *Perdue v. Union City, Ga.*, No. CIVA 1:05CV00753 MHS, 2006 WL 2523094, at *3 n.3 (N.D. Ga. Aug. 28, 2006) (unpublished).

[2] Two officers testified to the jail's unwritten policy of checking on suicidal inmates every thirty minutes, at a minimum.

[3] It is unclear from the record whether the general population is checked hourly after 11 p.m. or if the 11 p.m. check is the last check until morning.

The jail's policy also requires the Officer-in-Charge to complete a Suicide Prevention Monitoring (SPM) log for each inmate placed on suicide watch. This log is to include, *inter alia*, the maximum time between surveillance rounds and any special instructions. The Officer-in-Charge is to insure surveillance rounds are being made and properly documented on the SPM log.

B.      Jorgensen's Suicide

This was an unfortunate event. On March 23, 2009, Jorgensen was arrested on a state parole violation and booked into the Iron County Jail. On April 4, 2009, his wife died. He was released until April 8 to attend the funeral. He obtained an extension of the furlough but his lawyer failed to document the extension. Thus, when Jorgensen did not report back to the jail on April 8, he was arrested. Because officers discovered two empty pill bottles at the hotel where Jorgensen was arrested, he was placed on medical watch at the jail.[4]

In the early morning hours of April 9, a jail officer noted Jorgensen was "acting funny." (Appellee's App'x Vol. II at 279.) The officer informed Shaver, the Officer-in-Charge at the jail, of Jorgensen's behavior and suggested he be placed on suicide watch. As Jorgensen was being outfitted in a suicide smock, pills were found on his person. Jorgensen was placed in Cell B1.

---

[4] We mention medical watch only for historical accuracy. It is a lower level of monitoring than suicide watch, with which we are here concerned.

Later that day, at approximately 3:00 p.m., a mental health professional cleared Jorgensen to be released from suicide watch. He was placed in the general population. Approximately two hours later, he fell from his bunk and was taken to the hospital for treatment. At the hospital and upon being transported back to the jail, he made various suicidal-type statements to the transporting officers such as "I want all of this to be over," "I want to join my wife," and "I need to talk to a counselor, I'm having bad thoughts." (Appellee's App'x Vol. II at 315.) The transporting officers reported these statements to Shaver. Though he insisted he was not suicidal, Jorgensen was placed on suicide watch for the second time. He was strip searched, changed into a suicide smock (which he resisted) and given two suicide blankets. After Shaver inspected the cell, Jorgensen was again placed in Cell B1. He was not happy. Prior to entering the cell, he hit the cell door with his fist.

An SPM log was prepared, presumably by Shaver. But, contrary to the jail's policy, the log did not set a maximum time between surveillance rounds or provide other special instructions.[5]

Shaver remained in the booking area. She and other staff observed Jorgensen near the cell door most of the time; Jorgensen also spoke with deputies. Shaver delivered his dinner and also provided ice for his hand, which was swollen from hitting the cell door.

---

[5] While the written policy does not set a maximum time, it requires the log to establish one.

At approximately 8:30 p.m., Jorgensen requested to speak with someone. Shaver contacted the Southern Utah Mobile Crisis Team, which sent volunteer Royce Houchen to the jail.[6] Shaver told Houchen about Jorgensen's wife's recent death. Houchen talked with Jorgensen for about fifteen minutes. According to Houchen's report to Shaver, Jorgensen had talked about his problems and "would be all right." (Appellants' App'x Vol. I at 79.)

At approximately 9:21 p.m., an officer responded to Jorgensen's request for a roll of toilet paper. At about 9:30 p.m., Shaver left the booking area to conduct a facility count in which she and the other officers on duty verified every inmate was in his proper location. The count lasted until approximately 9:50 p.m. Shaver then went to the squad room to work on reports until 10:40 p.m. From 9:21 p.m. until 10:41 p.m., Shaver believed other deputies were checking on Jorgensen because the cell was in the booking area, the highest traffic area of the jail, and she could hear officers moving in and out of doors near the booking area. In fact, no one checked on Jorgensen during this time frame—a total of eighty minutes.[7]

---

[6] Other than being a crisis center volunteer, Houchen's credentials are not revealed by the record.

[7] There were four other jail employees present at the jail after the facility count at 9:30 p.m.: (1) Anna Teeples, who was hiding in the jail's laundry room as part of canine training occurring at the jail; (2) Kerrie Turrill, who was eating her lunch and working on paperwork with Shaver; (3) Brent Burr, who was also eating his lunch and working on paperwork in the lobby; and (4) Jeffrey Sorenson, who was manning Central Control by opening and closing various secure doors throughout the jail as needed. Jeffrey Malcom, a patrol officer, was also at the jail to conduct the canine training.

About 10:41 p.m., Shaver went to see Jorgensen. She could see only his feet through the cell's window. Because Jorgensen would not respond to her verbal commands, she believed he was hiding from her. She called for assistance. Once assistance arrived, Jorgensen was found hanging from a capped-off water pipe in the wall.[8] Jorgensen had pulled the pipe from the wall and had used the hem of the suicide blanket as a ligature.[9] Medical personnel arrived at the scene and declared Jorgensen dead. Prior to Jorgensen's suicide, the jail had never had an inmate commit suicide while housed in a suicide watch cell; the only previous suicides at the jail (one in 1990 or 1991 and one in November 2006) had occurred while the inmates were housed in the general population.

C.     This Lawsuit

During the hearing on Defendants' summary judgment motion, the judge became concerned as to whether Cell B1 contains a blind spot preventing sufficient monitoring

---

[8] In her appellate brief, Bame says it is disputed whether the water pipe is a shower head or fire sprinkler head. It appears to be the latter. But, as Bame admits, the distinction is immaterial. Most of the evidence in the record indicates the pipe was flush with the wall. Only one individual testified to the contrary, saying the pipe protruded from the wall; he did not indicate by how much.

[9] An inspection of the cell after Jorgensen's suicide revealed two screws used to hold the floor drain to the floor were protruding a couple of millimeters from the top of the drain. Fibers consistent with the torn suicide blanket were found in the top of the screw heads. The inspection also revealed fibers on a rough edge of the concrete floor; it is unclear whether those fibers were consistent with those of the torn suicide blanket. While Bame mentioned the presence of these screws in the district court in arguing the cell was inadequate to house a suicidal inmate, she does not suggest any liability based on the existence of the screws or the rough concrete on appeal. We note these facts because they suggest the means Jorgensen may have used to tear the suicide blanket.

from outside the cell. Defendants supplemented the record with evidence indicating the cell does not have a blind spot.[10] The judge denied the motion. He did not articulate his reasoning but, based on his comments at the hearing, it appears he denied the motion as to the County, Gower and Allred due to the layout of the suicide watch cell and as to Shaver due to her failure to follow the jail's suicide prevention policy, in particular, the requirement the inmate be adequately monitored.

## II. JURISDICTION

Bame claims we lack jurisdiction. She says Defendants mistakenly believe this appeal is from the denial of qualified immunity when in fact it is from the denial of summary judgment. And because the district judge drew his legal conclusion—denial of summary judgment—from specific facts, Bame claims we lack jurisdiction to delve behind the ruling and review the record to determine if the judge correctly found a genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a).

She is mistaken on both counts. Defendants raised the qualified immunity defense in their motion for summary judgment. While the judge did not specifically rule on the issue, he did cite the qualified immunity standard in a footnote in his order denying summary judgment. He obviously decided Defendants were not entitled to the defense and the correctness of that decision is the central issue in this appeal.

---

[10] Bame objected to the supplemental materials. It is unclear whether the judge considered them. For our purposes here, we assume the cell contains a blind spot, making any objection to the supplemental materials irrelevant.

As to our jurisdiction, 28 U.S.C. § 1291 permits us to review "all final decisions of the district courts of the United States." An order denying summary judgment is ordinarily not an immediately appealable final order under § 1291. *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013). However, the denial of a summary judgment motion resting on qualified immunity is immediately appealable to the extent it involves an abstract issue of law. *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013). We may review (1) whether the facts the district judge found adequately supported by the record are sufficient to show a legal violation and (2) whether the law was clearly established at the time of the alleged violation. *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010). However, if the district judge does not "identify the particular charged conduct [he] deemed adequately supported by the record, we may look behind the order denying summary judgment and review the entire record *de novo* to determine for ourselves as a matter of law which factual inferences a reasonable jury could and could not make." *Id.*; *see also Armijo By & Through Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1259 (10th Cir. 1998) ("[I]f the district court does not identify the particular charged conduct that it deemed adequately supported by the evidence, a court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court likely assumed.") (quotations omitted).

Since the judge did not explain his decision to deny qualified immunity, "it falls on us to review the entire record, construing the evidence in the light most favorable to [Bame] as the plaintiff, and to ask *de novo* whether sufficient evidence exists for a

- 9 -

reasonable jury to conclude [Defendants] trenched upon [Jorgensen]'s clearly established rights." *Lewis*, 604 F.3d at 1228. The dispositive facts are not in dispute.[11]

That said, a problem remains. Qualified immunity does not apply to the County.[12] *See Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1263 n.4 (10th Cir. 2009) ("Qualified immunity . . . is available only in suits against officials sued in their personal capacities, not in suits against governmental entities or officials sued in their official capacities."). Therefore, the judge's ruling as to the County must be limited to a denial of summary judgment, which is normally not immediately appealable. *Roosevelt-Hennix*, 717 F.3d at 753. But there is a limited exception.

We have the discretion to exercise pendent appellate jurisdiction over an otherwise nonfinal and nonappealable order if it is "inextricably intertwined" with an appealable decision or where review of the nonappealable decision is "necessary to ensure meaningful review" of the appealable decision. *Swint v. Chambers Cnty. Comm'n*, 514

---

[11] We are cognizant of *Tolan v. Cotton*, - - U.S. - -, No. 13-551, 2014 WL 1757856, at *1 (U.S. May 5, 2014) (reversing where circuit court, in holding police officer was entitled to qualified immunity because he did not violate clearly established law, "failed to adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor") (quotations omitted).

[12] Although neither side draws the distinction, Gower and Allred were sued in both their official and individual capacities. Because "[o]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent," *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), we will refer here simply to the County but our reasoning would apply equally to the official capacity claims against Gower and Allred. *See Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) ("To the extent Martinez brings a claim against [Sheriff] Beggs in his official capacity, it is the same as bringing a suit against the county."); *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998) (same).

U.S. 35, 50–51 (1995); *see also Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995). "[A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Moore*, 57 F.3d at 930.

Because, as we will explain, Bame has not shown the individual defendants to have violated Jorgensen's Eighth Amendment rights, the County cannot be held liable. *See Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) ("A county . . . cannot be held liable for constitutional violations when there was no underlying constitutional violation by any of its officers.") (quotations omitted); *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998) (for a failure to train claim to succeed against a county, the plaintiff must show an underlying constitutional violation by the individual officers). The County's appeal from the denial of summary judgment is "inextricably intertwined" with the individual defendants' qualified immunity appeal and we have jurisdiction over it. *See Moore*, 57 F.3d at 930-31 (exercise of pendent appellate jurisdiction proper over the City's appeal from denial of summary judgment because appeal was inextricably intertwined with city official's appeal from the denial of qualified immunity; resolving qualified immunity issue in favor of city official completely resolved claim against the City).

- 11 -

We have resolved the matter of our jurisdiction and have simultaneously foreshadowed our resolution of the claims against the individual defendants. We now explain why reversal is necessary.

### III. DISCUSSION

"We review de novo a district court's decision to deny a summary-judgment motion that asserts qualified immunity." *Eidson v. Owens*, 515 F.3d 1139, 1145 (10th Cir. 2008). "This court reviews summary judgments based on qualified immunity differently than other summary judgments. When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (quotations omitted). We maintain the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because Gower, Allred and Shaver did not violate Jorgensen's Eighth Amendment rights, we need not entertain a "clearly established" debate.

Prison officials cannot absolutely guarantee the safety of their prisoners. *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999). However, they must take reasonable measures to ensure prisoner safety. *Id.*; *see also Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1499 (10th Cir. 1990). Claims arising from a failure to prevent a prisoner suicide "are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand Cnty., Utah*, 119 F.3d

- 12 -

862, 866 (10th Cir. 1997). Thus, for Bame to prevail on her Eighth Amendment claim, she must show Gower, Allred and Shaver were "deliberately indifferent to a substantial risk of suicide." *Id.* at 869 (quotations omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding deliberate indifference to the serious medical needs of prisoners constitutes an Eighth Amendment violation).

"Deliberate indifference has objective and subjective components." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component requires the harm suffered to be sufficiently serious. *Id.* Suicide qualifies. *See Gaston v. Ploeger*, 229 F. App'x 702, 710 (10th Cir. 2007) (unpublished)[13] (citing *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) ("[I]t goes without saying that suicide is a serious harm.")). The subjective component requires the defendant to have acted with a "sufficiently culpable state of mind." *Self v. Crum*, 439 F.3d 1227, 1230-31 (10th Cir. 2006) (quotations omitted). "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan*, 471 F.3d at 1159 (quotations omitted). "[A] prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm

---

[13] Unpublished opinions are not binding precedent. 10th Cir. R. App. P. 32.1(A). We mention *Gaston* and the other unpublished decisions throughout this opinion because of their persuasive and reasoned analysis.

- 13 -

exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

A.      Corporal Shaver

Bame contends Shaver, as the Officer-in-Charge, knew Jorgensen was at a substantial risk of committing suicide given the recent loss of his wife, his suicidal statements and his placement on suicide watch (twice).  Despite this known risk, Bame tells us, Shaver failed to take reasonable measures to abate it by failing to (1) monitor Jorgensen for eighty minutes or to assure others were doing so, (2) establish the maximum time between surveillance rounds, or (3) provide special instructions as to what care Jorgensen needed.

Obviously Shaver knew Jorgensen was a suicide risk as she placed him on suicide watch.  But her actions in response to that known risk do not amount to deliberate indifference; they are far from it.  Once Jorgensen made statements indicating he was suicidal, Shaver placed him on suicide watch in Cell B1, a cell specifically designated as a suicide prevention cell.  Before doing so, she inspected the cell and stripped him of all objects and clothing except a suicide smock and two suicide blankets, both of which are specifically designed to prevent their use as a ligature.  When he asked to speak to someone, she called in Houchen, a crisis center volunteer, who said Jorgensen "would be all right."  (Appellants' App'x Vol. I at 79.)  She monitored him for all but eighty minutes.  And during that time frame, she reasonably believed he was being observed by other deputies because the cell is located in the booking area, the highest traffic area of the jail.  While she was ultimately wrong about continuing observation—no one checked

on Jorgenson for eighty minutes—her error amounts to negligence at the most. That is insufficient to establish deliberate indifference. *See Farmer*, 511 U.S. at 835.

Admittedly, Shaver failed to follow several of the jail's suicide prevention policies: she did not establish the maximum time between surveillance rounds or verify he was being observed. But such violations alone do not necessarily imply acts of deliberate indifference. *See Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation."); *see also Hostetler v. Green*, 323 F. App'x 653, 657-58 (10th Cir. 2009) (unpublished). This is especially true where no evidence suggests how Shaver knew or should have known Jorgensen might be able to commit suicide while housed in a suicide prevention cell with only two suicide blankets and dressed in a suicide suit. The jail had never had a suicide occur in such a cell.[14] And there is no evidence she knew or should have known the capped-off water pipe could be pulled out of the wall and used as a hanging tree or a suicide blanket could be ripped and used as a ligature.

---

[14] The absence of a prior suicide in a suicide watch cell goes to Shaver's notice of a substantial risk. In *Daniels v. Glase*, the plaintiff's husband committed suicide while housed at the county jail. No. 97-7115, 1999 WL 1020522 (10th Cir. Nov. 3, 1999) (unpublished). She sued the sheriff alleging, among other things, he inadequately staffed the jail, which resulted in her husband's suicide. We rejected this argument. *Id.* at *5. While only one officer was on duty at the jail at the time of the suicide, we noted there had been no prior suicide attempts or successful suicides at the jail. *Id.* "No other facts suggest that the jail had experienced problems of any kind arising from jail staffing levels or training of jail personnel, nor that [the sheriff] was aware of problems arising from his staffing levels or other jail procedures." *Id.*

In summary, Shaver may have known Jorgensen presented as a suicide risk, but there is no evidence the risk was excessive or the suicide watch cell contributed to the risk. Moreover, considering the totality of the circumstances, her administrative oversights do not demonstrate a conscious disregard of the risk; to the contrary, she took reasonable steps to abate it.

B.    Sheriff Gower and Captain Allred

Liability under § 1983 must "be predicated on a violation traceable to a defendant-official's 'own individual actions.'" *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Thus, "government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Id.* (quotations omitted). Personal involvement, however, "does not mean . . . direct participation is necessary." *Id.* A government official can be held liable (in a § 1983 suit) for a constitutional violation under a theory of supervisory liability but only if the plaintiff shows: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

Bame claims Gower, as sheriff, and Allred, as the jail's commander, violated the Eighth Amendment rights of all at risk prisoners, Jorgensen included, by authorizing Cell B1 to be used as a suicide watch cell. She says, correctly, both are responsible for implementing and enforcing the jail's policies, in particular its suicide prevention policy.

- 16 -

The policy requires suicide watch cells to be stripped of all features likely to be used by an inmate to commit suicide.[15] According to Bame, their approval was constitutionally improper in light of their knowledge of the capped-off water pipe (which had been

_____

[15] The policy provides:

**Procedure:  Cell Furnishings**

    A.  Observation cells should be inspected to find features which may require attention before the cells can be used to house suicide risks.

    B.  There are a variety of cell features which have been used by prisoners to commit or attempt suicide, including:

        1. **structural members** to which a ligature can be tied—bars, vent covers, grille, sprinkler heads, shower fixtures, light fixtures, bunk frames, bunk ladders;

        2. **electrical**—outlets, wiring, conduit, extension cords, appliances; and

        3. **toilets**—drowning.

    C.  Improve the safety and suicide resistance of observation cells.

        1. Where feasible, modifications should be considered to observation cells to reduce the features which may be exploited by suicidal prisoners (E.g., using breakaway wall hooks and shower rods; removing ladders to upper bunks, electrical outlets; installing tamper-resistant lighting and suicide-resistant vent grilles).

        2. Elimination of places to tie a ligature is no guarantee that a prisoner cannot commit suicide.

        3. While it is unrealistic to assume that a cell can be rendered suicide proof, the inability to suicide proof cells can be offset to some extent with effective supervision and prisoner management.

(Appellee's App'x Vol. II at 366-68 (footnotes omitted).)

attractive to inmates housed in the cell in the past), the cell's blind spot preventing sufficient monitoring, and the lack of a surveillance camera in the cell.

Bame's argument about the water pipe, the blind spot, and the lack of a surveillance camera all sound remarkably like the tort of negligent design, a state remedy, not a constitutional violation. *See Gaw v. State of Utah ex rel. Dep't of Transp.*, 798 P.2d 1130, 1136-41 (Utah Ct. App. 1990) (negligent design of intersection). In any event, Gower and Allred's approval of Cell B1 as a suicide watch cell does not state a constitutional violation.

Both Gower and Allred knew Cell B1 had contained a sprinkler head. They also knew the sprinkler head had been used in the past by inmates housed in the cell. But the prior use was to cause trouble—breaking the sprinkler head to flood the cell—not to facilitate suicide. Indeed, it was the use of the sprinkler head to flood the cell which led to it being capped off. Gower and Allred testified they believed the cap was flush with the wall. Neither considered it a potential instrumentality of suicide. There is simply no evidence showing either to have known or had reason to know the capped-off water pipe could be pulled from the wall and used as a structural member for a hanging.

The alleged blind spot in Cell B1 is a red herring. Assuming there was a blind spot in the cell (a charitable assumption), it had nothing to do with the lack of monitoring by jail personnel. Bame has not explained how Gower or Allred's approval of a jail cell with a blind spot as a suicide prevention cell caused Jorgensen's suicide. *See Daniels v. Glase*, No. 97-7115, 1999 WL 1020522, at *5 (10th Cir. Nov. 3, 1999) (unpublished) (concluding no constitutional violation was shown where plaintiff failed to demonstrate

the failure to fill out a medical evaluation form or the jail's staffing level caused the inmate's suicide). If anything, the suicide resulted from a failure of frequent monitoring, which, as we have explained, did not amount to deliberate indifference.

Bame has another argument relating to the blind spot but we decline to accept the suggestion that the failure to have a surveillance camera in Cell B1 constitutes a constitutional violation. She does not cite any legal authority for this proposition and we have not uncovered any. Indeed, "jailers have [no] constitutional duty to monitor inmates constantly. [J]ailers are neither obligated nor able to watch every inmate at every minute of every day." *Gaston*, 229 F. App'x at 711.

Charitably construing her brief, Bame may also be suggesting that Gower and Allred were deliberately indifferent to a substantial risk of Jorgensen's suicide in particular.[16] But Gower did not know Jorgensen was an inmate at the jail let alone that he had been placed on suicide watch. While Bame claims Allred knew Jorgensen had been placed on suicide watch, the undisputed facts show Allred knew Jorgensen had been placed on suicide watch in the early morning hours of April 9 (the first time) but was not aware Jorgensen was returned to suicide watch later that evening (the second time). In

---

[16] In her brief, Bame states: "From the record evidence, a jury reasonably could conclude Defendant Allred was negligent and that his negligence played a causative role in Mr. Jorgensen's death." (Appellee's Br. at 24.) The quote is quite revealing. Bame would have us treat a claimed Eighth Amendment violation as a simple tort. That is simply wrong. As noted above, negligence is not enough. *See Farmer*, 511 U.S. at 835.

- 19 -

this case, neither Gower nor Allred knew of a specific and excessive risk of harm to Jorgensen on the night of his suicide.[17]

**REVERSED AND REMANDED.** We **DENY** Defendants' motion to file Volume II of their appendix under seal.[18] We **GRANT IN PART** Defendants' motion to strike Bame's appendix. Those portions of Bame's appendix which were not filed with the district court are **STRICKEN**. We have not considered this evidence. In all other regards, the motion is **DENIED**.[19]

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

---

[17] Moreover, because we have concluded Shaver did not violate Jorgensen's constitutional rights, neither Gower nor Allred can be held liable under a theory of supervisory liability. *See Martinez*, 563 F.3d at 1092.

[18] Volume II is the jail's suicide prevention policy and has been provisionally sealed. It will remain sealed for 20 days, during which Defendants may renew their motion saying chapter and verse what specifically needs to be sealed and why redaction is inadequate. At the end of the 20 days, the Clerk of this Court will unseal Volume II unless the panel has entered a supplemental sealing order.

[19] As to those portions of Bame's appendix which were filed under seal or were the subject of a protective order in the district court, we will consider sealing them if, within 20 days, Defendants move to seal, providing convincing reasons and explaining why redaction is insufficient. *See supra* n.18.